THIRD DIVISION
November 5, 2008

Nos. 1-06-2759; 1-07-0029 (Consolidated)

No. 1-06-2759

| | | |
|---|---|---|
| PATRICIA JOHNSON and LINNEA JOHNSON, a Minor,  by PATRICIA JOHNSON, her Mother and Next Friend, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 03 L 65023 |
| | ) | |
| WILLIAM JOHNSON, RAMONA JOHNSON, and TOP BRASS HORSE FARMS, INC, a Corporation, | ) ) ) | |
| | ) | |
| Defendants-Appellants | ) | |
| | ) | |
| (David Johnson, | ) | The Honorable |
| | ) | Carol Pearce McCarthy, |
| Third-Party Defendant-Appellee). | ) | Judge Presiding. |

No. 1-07-0029

| | | |
|---|---|---|
| PATRICIA JOHNSON and LINNEA JOHNSON, a Minor, by PATRICIA JOHNSON, her Mother and Next Friend, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 03 L 65023 |
| | ) | |
| WILLIAM JOHNSON and RAMONA JOHNSON, | ) | The Honorable |
| | ) | Carol Pearce McCarthy, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following trial, a jury returned a verdict against plaintiffs Linnea Johnson and her mother

Nos. 1-06-2759; 1-07-0029 (Consolidated)

and next friend Patricia Johnson on their claim against defendants Ramona and William Johnson brought pursuant to the Animal Control Act (Act or Animal Control Act) (510 ILCS 5/16 (West 2002)). Both parties have appealed, contesting various rulings made by the trial court. Specifically, plaintiffs contend that the trial court erred when it: (1) allowed defendants to assert comparative negligence as an affirmative defense to their claim brought under the Act; (2) instructed the jury on comparative negligence; (3) allowed defendants' expert to testify; and (4) declined to grant plaintiffs' motion for a directed verdict on the issue of liability. Alternatively, plaintiffs assert that the jury's verdict was against the manifest weight of the evidence. On cross-appeal, defendants maintain that the trial court erred in finding that the settlement agreement reached between plaintiffs and David Johnson, Linnea's father, who was named as a third-party defendant, was reached in good faith as required by the provisions of the Illinois Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 et seq. (West 2002)). We affirm in part and reverse in part and remand for a new trial.

On March 15, 2003, seven-year-old Linnea Johnson accompanied her father, David Johnson, to Top Brass Horse Farms (Top Brass), where she was kicked in the back by Gambler, a horse that at the time of the accident was owned by defendant Ramona Johnson but was in the immediate control of Ramona's husband, defendant William Johnson.[1] On August 7, 2003, Linnea, by her mother and next friend, Patricia, filed a complaint against Top Brass and William and Ramona Johnson, seeking to recover monetary damages pursuant to the provisions of the Animal Control Act (510 ILCS 5/16 (West 2002)) and the Rights of Married Persons Act,

---

[1] The Johnson defendants are of no relation to the Johnson plaintiffs.

2

commonly know as the "Family Expense Act" (750 ILCS 65/15 (West 2002)).

In pertinent part, the complaint alleged that at the time of the accident, Linnea was lawfully on defendant Top Brass's premises, where defendants William and Ramona Johnson boarded their horse Gambler, and was conducting herself peaceably when Gambler kicked her in the back without provocation, thereby causing permanent damage to one of her kidneys. The defendants filed answers denying that Linnea and her mother were entitled to relief under the provisions of the Animal Control Act or the Family Expense Act. On October 12, 2004, defendants William and Ramona Johnson filed a third-party complaint for contribution against Linnea's father, David Johnson, and an amended third-party complaint on March 17, 2005. In the amended third-party complaint, the Johnson defendants alleged that David "[f]ailed to properly supervise [Linnea] when he knew of the dangerous propensities and unpredictability of horses" and "[f]ailed to properly instruct and train [Linnea] about the dangerous propensities and unpredictability of horses" and, accordingly, his actions directly and proximately caused Linnea's injuries. Thus, in the event they were found liable for Linnea's injuries, the Johnson defendants contended that they were entitled to contribution from David pursuant to the provisions of the Contribution Act (740 ILCS 100/1 et seq. (West 2002)). On February 4, 2005, defendant Top Brass also filed a third-party complaint for contribution against David Johnson as well as a counterclaim for contribution against the Johnson defendants.

Thereafter, the parties engaged in discovery and each of the parties was deposed. The parties then engaged in settlement negotiations. Ultimately, plaintiffs reached settlement agreements with third-party defendant David Johnson and defendant Top Brass. The trial court

conducted a hearing to determine whether the settlement agreements were made in good faith as required by the Contribution Act. At the hearing, the Johnson defendants did not contest the propriety of the $82,500 settlement reached between plaintiffs and Top Brass, but they did dispute the good faith of the $7,500 settlement reached between plaintiffs and David Johnson. Specifically, at the hearing, defense counsel argued: "Here we have an issue where certainly what could be more collusive than the father and mother to benefit the case that they're bringing and entering into this settlement for a fraction of 1 percent of what they're demanding in this case." Counsel noted that Top Brass settled for a much higher amount even though "Top Brass Farms didn't own the horse, wasn't even present, didn't control the horse in any fashion, was just the owner of the stable where they kept horses." David Johnson's counsel responded, noting that the "fact that two settling parties have a friendly or close relationship in and of itself doesn't show collusion" and that the size of the settlement alone is not indicative of the existence or lack thereof of good faith. At the conclusion of the hearing, the trial court rejected the Johnson defendants' arguments, stating, "I certainly don't find fraud, and I don't find that there's collusion here." Accordingly, on August 10, 2006, the trial court entered two orders finding that the settlement agreements reached between plaintiffs and Top Brass and plaintiffs and David Johnson were made in good faith as required by the Contribution Act. Accordingly, the trial court ordered that all claims against third-party defendant David Johnson and defendant Top Brass were dismissed with prejudice.

Thereafter, on August 11, 2006, plaintiffs filed their third amended complaint, naming William and Ramona Johnson as the sole defendants. As with the prior complaints, plaintiffs

4

sought to recover damages under the Animal Control Act and the Family Expense Act.  In response, the Johnson defendants advanced several affirmative defenses, which they asserted effectively barred plaintiffs from obtaining the requested relief.  Specifically, the Johnson defendants alleged that: Linnea assumed the risk of injury when she and her parents placed her in the presence of horses where there was a foreseeable risk of injury; Linnea was guilty of contributory negligence when she "approached and/or touched the horse Gambler from behind without first announcing and making known to Gambler her presence" and her negligence was the proximate cause of her injury; and David Johnson was guilty of contributory negligence because he "failed to watch and supervise his daughter, and by his actions placed her at risk, while she wandered around the horse barn," and his negligence proximately caused Linnea's injuries.[2]

Plaintiffs moved to strike defendants' affirmative defenses arguing, in pertinent part, that contributory negligence was not a valid defense to an action brought under the Animal Control Act.  After hearing arguments from the parties, the trial court denied plaintiffs' motion, finding that the case law "allow[s] for both assumption of the risk and for contributory negligence."

Thereafter, the parties proceeded to trial.  At trial, defendant William Johnson testified that his wife Ramona purchased Gambler, a palomino quarter horse, in 2003 from a family farm

---

[2]  Although defendants phrased their affirmative defense in terms of contributory negligence, the parties disputed, and the jury was subsequently instructed on the defense of comparative negligence, as it is set forth in section 2-1116 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1116 (West 2002)).

in Wisconsin. Because the previous owners had children, Gambler was accustomed to the presence of children. Ramona also owned another horse, Guy, and boarded both horses at Top Brass, located in Cook County. William explained that Top Brass is located on 15 acres of land and contains multiple buildings. The horses are boarded in a round barn, and a hay barn is located to the north of the round barn. William was familiar with other people who boarded their horses at Top Brass, including David Johnson, Linnea's father.

On March 15, 2003, William and his wife were at Top Brass tacking their horses, preparing to ride them, when he saw David and Linnea arrive in the round barn. David led his horse Freebucks out of the barn intending to wash him. When William finished tacking Gambler, he led the horse by the reins out of the barn and encountered David and Linnea, who were brushing Freebucks in the thoroughfare leading out of the round barn. William stated that the thoroughfare was not an area for grooming horses. Because Freebucks was blocking the thoroughfare, and William could not safely lead Gambler around Freebucks, he stopped and conversed with David. He stood parallel with Gambler's front legs and held Gambler's reins. While they conversed, Linnea began to walk toward the round barn. Shortly thereafter, as he was holding Gambler's reins, William felt Gambler shuffle and shift his weight from his right leg to his left leg. He then heard Linnea cry out. When he looked back, he saw Linnea on the ground. William also saw a horse grooming brush on the ground as well, located approximately 18 inches away from the wall of the hay barn. William did not see Gambler kick Linnea nor did he see Linnea provoke Gambler in any manner. William indicated that it is unsafe for a person to pass behind the back of a horse, explaining "[t]hey are totally blind there. They are totally vulnerable

6

and they're going to kick." William classified Gambler as a calm horse and denied that there had been any prior incidents involving Gambler causing injury to another person.

William's wife, Ramona, confirmed that she is the "proprietary owner" of Gambler. On March 15, 2003, she was in the barn tacking up her other horse, Guy, when Linnea came into the barn and asked Ramona for a scraping tool. Approximately one minute later, after she had given Linnea the requested tool, Ramona heard a scream. She exited the barn and saw William and David standing by their horses and Linnea lying on the ground. Prior to the accident, Ramona had seen Gambler interact favorably with children and he had never before caused injury to a child. Because she had been around horses since she was a child, Ramona knew that it was unsafe for a person to walk behind a horse without alerting the horse to the person's presence.

David Johnson testified that he visited Top Brass, where he boarded his horse Freebucks, approximately three to four times per week. Because Top Brass permitted children to be on the premises, his daughter Linnea would frequently accompany him to the farm. On March 15, 2003, he and his daughter arrived at Top Brass at approximately 12 noon because Linnea had a riding lesson that afternoon. In the barn, he noticed William and Ramona Johnson tacking their horses, preparing them to be ridden. Because it had rained the previous day, Freebucks was covered in mud. Accordingly, David obtained a brush container and led Freebucks out of the round barn to a wash rack located outside. He placed the brush container on the ground near the hay barn. After washing Freebucks, he led the horse to the wall of the hay barn to "let the heat off of the barn warm the horse." As David and Linnea waited for Freebucks to dry, William exited the round barn with Gambler. David then instructed Linnea to return a tool to the brush

7

box that he had left on the ground near the south wall of the hay barn. William stopped with Gambler and the two men conversed. David noticed Gambler shuffle his front legs and immediately thereafter he heard his daughter scream. He saw Linnea on the ground crying and complaining of pain. David noted that the helmet that she had been wearing was cracked. He drove Linnea to Palos Hospital, where she was examined. Thereafter, Linnea was transported by helicopter to Loyola Hospital.

Because he had been around horses since he was a child, David knew that a person should not walk behind or approach a horse from the rear because there is the possibility that the horse may kick. David never saw Linnea move behind Gambler nor did he see Gambler actually strike his daughter.

Linnea confirmed that she was present at Top Brass on March 15, 2003, because she had a riding lesson. She testified that she had been riding horses almost daily since the age of four and that her father had instructed her about horse safety. In particular, he informed her that she should avoid walking behind horses and that if she were to find herself in the back of a horse, she should "tell the horse that [she was] there" to avoid startling the horse. Upon their arrival at Top Brass, Linnea and her father discovered that Freebucks was dirty, so they took him out of the round barn to an outdoor wash rack to clean him. She was carrying the brush box and put it down by the hay barn wall before she and her father started washing Freebucks. After they washed Freebucks, Linnea and her father led Freebucks to the hay barn wall to allow him to dry. At that point, William exited the round barn with Gambler, stopped several feet away, and began conversing with her father. Linnea walked over to the hay barn wall to get a brush from the

8

brush box. As she was kneeling by the box, she heard Gambler shuffle his feet and then she was kicked. The kick propelled her into the barn wall and cracked the riding helmet that she had been wearing. She denied that she had walked behind Gambler prior to being injured. After receiving medical treatment, Linnea began riding horses again approximately six months after her accident.

Patricia Johnson testified that on March 15, 2003, her husband called her and informed her that Linnea had been injured. After Linnea was transported to Loyola Hospital, she underwent surgery and stayed in the hospital until March 23, 2003. Following Linnea's discharge, however, she complained of pain when urinating. On April 12, 2003, Linnea was readmitted to Loyola because she suffered from a fever and an infection. Doctors installed a drain on Linnea's right side to drain her urine. Later, doctors inserted a catheter and a nephrostomy tube to drain Linnea's urine. During this time, Linnea was essentially bedridden. Thereafter, Linnea underwent a second surgery, which she "tolerated very well." Prior to March 15, 2003, Linnea had been in good health and had not had any problems with her kidneys.

The parties stipulated that the total cost of the medical care that Linnea received in connection with the accident totaled $79,137.49.

Dr. Carl Blond, an internal medicine and nephrology (kidney disease) specialist, testified as plaintiffs' retained medical expert. Upon review of Linnea's medical records, Dr. Blond opined that Linnea suffered damage to her right kidney. Specifically, there was a "loss of blood supply to the lower part of her right kidney," which he classified as "permanent damage." In particular, a renal scan taken on January 6, 2004, that compared the functioning capabilities of both kidneys showed that Linnea's right kidney functioned at 29% while her left kidney

9

functioned at 71%. Dr. Bond testified that a renal scan of "two normal kidneys would be 50/50, each kidney does approximately half the work." He explained that due to the damage to Linnea's right kidney, her left kidney was required to do a "higher percentage of the total work." Based on his knowledge, training, experience, and review of Linnea's medical records, Dr. Bond opined that Linnea's kidney injury put her at risk for future medical problems. In particular, he indicated that "there is a substantial risk *** that she'll develop hypertension in the future." Specifically, he stated that Linnea had a 30% chance of developing hypertension within 20 years, whereas a healthy 30-year-old's chance of developing hypertension was less than 1%. In addition, Dr. Bond opined that there was an additional risk to Linnea's left kidney, "which has already hypertrophied to some degree to make up for the damage that was done in the initial insult." Dr. Bond acknowledged that he formed his opinions without personally examining Linnea or conferring with her treating physician.

Dr. Bruce Lindgren, a pediatric urologist, was one of the physicians who treated Linnea following her accident. When she was admitted to the hospital on March 15, 2003, Linnea had a laceration to her right kidney as well as several hematomas surrounding her kidney. He classified the laceration as a "Grade IV" laceration, with "I being the least and V the worst." In addition, Linnea's kidney was leaking, such that "the urine wasn't going in the direction it was supposed to, but was kind of leaking out around the kidney." To fix the leak, Dr. Lindgren inserted a stent into Linnea's bladder, which acted as "internal drain." Linnea was released on March 23, 2003. She was readmitted to the hospital on April 3, 2003, because she was experiencing a fever, which was the result of an infection. Linnea was prescribed antibiotics and

the radiologist installed a perinephric drain around her kidney to drain the infected area. She was released from the hospital shortly thereafter, but was readmitted on April 23, 2003. Because Linnea still had urine leakage as a result of her injury, doctors installed a Foley catheter in her bladder to drain her urine. On May 6, 2003, Linnea was still suffering from leakage, which doctors attempted to treat with a nephrostomy tube. Because none of these efforts were able to completely stop the leakage, Linnea underwent surgery on June 16, 2003, which successfully repaired the leak. Ultimately, however, a renal scan performed after the surgery showed that Linnea had lost some function in her right kidney, which Dr. Lindgren deemed to be "permanent." He acknowledged that Linnea's injuries were consistent with being kicked by a horse. Following her treatment, Dr. Lindgren did not place any restrictions on Linnea's activities and was aware that she had resumed riding horses.

Jessica Jahiel, a certified riding instructor, publisher of the Horse Sense newsletter, and author of over 1,500 books and articles on horses, testified as an expert for the defendants. After reviewing the deposition transcripts taken in the case, she formed various opinions about Linnea's accident. Familiar with horse safety, Jahiel opined that "[y]ou never try to approach [a horse] from behind" because "[a] horse cannot see directly behind it." To safely approach a horse from the rear, Jahiel explained that a person should "[t]ry to communicate first, and you would somehow approach from as much of an angle as you could. You would not come directly up behind the horse towards its tail." Jahiel classified horses as "prey animals. They're very nervous, sensitive animals." When startled, a horse reacts reflexively and "may jump forward, run, kick out, leap to the side. It's going to show its dismay in some way, and it's going to make

11

an instinctive effort to get away from whatever startled it." Approaching a horse from its blind spot in the rear "would probably provoke a reaction." She explained that when a person approaches a horse from behind without alerting the horse to her presence, it is "very frightening to a horse because it's predator behavior." Jahiel further opined that a person's failure to alert a horse to her presence is "a very common–altogether too common way of provoking a horse to kick out," but indicated that in the "majority of cases," a person who walks behind a horse will not get kicked.

Jahiel indicated that all horses have a "kick zone," an "area in which the horse will kick out most forcefully, most easily, and most readily." The size of the kick zone is dependant upon the size of the horse, but "by and large, the kick zone is anywhere up to four feet or so behind the horse." Generally, "[t]he greatest range and the strongest kick would be straight back. At a little angle–not much of an angle at all, a horse could still kick a person; but it wouldn't have anywhere near the same impact because it wouldn't be as strong." Jahiel described the reaction as "instinctive." She further explained that it is unlikely that a horse would kick to the side and stated that "[i]f it could do anything at all [to the side] it would be much less forceful." Based on her review of the relevant deposition testimony, Jahiel opined that Gambler's reaction was the result of provocation, explaining: "Anything that stimulates a horse to react suddenly and instinctively I would term provocation. I wouldn't put an interpretation of the action being thought out or deliberate or anything like that. It could be almost anything." In this case, Jahiel believed that Linnea entered Gambler's kick zone without alerting him to her presence and "may have touched the horse."

12

Thereafter, the parties delivered closing arguments. The trial court then provided the jurors with the relevant jury instructions, including instructions on negligence and comparative negligence. Following deliberations, the jury returned with a verdict in favor of defendants. Plaintiffs filed a timely posttrial motion, which the trial court denied. Plaintiffs then filed a timely notice of appeal. Defendants also filed a timely notice of cross-appeal disputing the trial court's finding that the settlement agreement reached between plaintiffs and third-party defendant David Johnson was reached in good faith.

We will first address the issues raised by plaintiffs on appeal. Specifically, plaintiffs assert that the trial court committed a number of errors, which entitle them to a new trial. Plaintiffs first contend that the trial court committed reversible error when it allowed defendants to advance the affirmative defense of comparative negligence at trial because it is not a proper defense to a claim brought pursuant to the Animal Control Act. Initially, defendants contend that plaintiffs have waived review of this issue and all other issues that they raise on appeal, and they assert two alternative bases for waiver. First, defendants contend that plaintiffs waived their appellate arguments because they failed to adequately raise them in their posttrial motion.

As a general rule, both a timely trial objection and a written posttrial motion are necessary to preserve an error for appellate review. Bauer v. Memorial Hospital, 377 Ill. App. 3d 895, 910 (2007). An appellant's posttrial motion "must contain a 'simple, succinct statement of the factual or legal basis' for the litigant's belief that the trial court erred." Lopez v. Northwestern Memorial Hospital, 375 Ill. App. 3d 637, 647 (2007), quoting Brown v. Decatur Memorial Hospital, 83 Ill. 2d 344, 350 (1980). An appellant's motion must be sufficiently specific to allow

13

Nos. 1-06-2759; 1-07-0029 (Consolidated)

for meaningful review. Webber v. Wight & Co., 368 Ill. App. 3d 1007 (2006). This requirement "is based on 'the sound policy of affording a trial judge the opportunity to reconsider and correct his rulings or otherwise take such action as may be indicated prior to appeal.' " Lewis v. Beckman, 57 Ill. App. 3d 482, 484 (1978), quoting Hammer v. Plontke, 98 Ill. App. 2d 235, 237 (1968).

Defendants acknowledge that each of the arguments raised by plaintiffs on appeal was included in their posttrial motion; however, defendants contend that plaintiffs' posttrial motion was insufficient. Specifically, defendants argue that plaintiffs' motion "offer[s] merely a blanket statement that the trial court committed error, which is sometimes followed with a case citation. In no instance is the case analyzed, or is the trial court advised why [p]laintiffs believed it erred. This is insufficient ***." Our review of plaintiffs' posttrial motion does not reveal any deficiencies precluding review, and we thus find defendants' waiver argument to be without merit

As an alternative basis, defendants contend that plaintiffs' brief fails to comply with the requirements of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7))[3] because it does not contain citations to the pages of the record on appeal and, accordingly, defendants urge us to strike plaintiffs' appellate brief.

Supreme Court Rule 341 sets forth the requirements for appellate briefs. In pertinent part, Rule 341(h)(7) requires the appellant to support his or her argument with "citation of the

---

[3] Defendants cite to Supreme Court Rule 341(e)(7); however, it is apparent from the substance of defendants' argument itself, that they are relying on Rule 341(h)(7).

14

Nos. 1-06-2759; 1-07-0029 (Consolidated)

authorities and *the pages of the record relied upon*." (Emphasis added.) 210 Ill. 2d R. 341(h)(7). Failure to cite to the pages in the record relied upon is thus a violation of Supreme Court Rule 341 and results in waiver of that argument. See, e.g., Gomez v. Finishing Co., 369 Ill. App. 3d 711, 723 (2006); Mikrut v. First Bank of Oak Park, 359 Ill. App. 3d 37, 61 (2005).

In this case, defendants are correct that plaintiffs' brief contains few citations to the record on appeal. However, because the doctrine of waiver is a limitation on the parties, not the reviewing court (Redelmann v. K.A. Steel Chemicals, Inc., 377 Ill. App. 3d 971, 976 (2007), citing Illinois State Chamber of Commerce v. Filan, 216 Ill. 2d 653, 664 (2005)), we will address the merit of plaintiffs' appeal.

Plaintiffs advance several reasons as to why the doctrine of comparative negligence is not a valid affirmative defense to an action brought pursuant to the Animal Control Act. Initially, plaintiffs assert that the plain language of the Act precludes application of the affirmative defense of comparative negligence to actions brought under its parameters.

The interpretation of a statute presents a question of law, which we review de novo. Kankakee County Board of Review v. Property Tax Appeal Board, 226 Ill. 2d 36, 51 (2007); SMRJ, Inc. v. Russell, 378 Ill. App. 3d 563, 578 (2007). When engaging in statutory interpretation, the primary goal is to ascertain the legislature's intent and the best indication of that intent is the plain language of the statute. MD Electrical Contractors, Inc. v. Abrams, 228 Ill. 2d 281, 287 (2008). Accordingly, when the plain language of a statute "is unambiguous, it must be enforced as enacted, and a court cannot depart from its plain language by reading into it exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent."

15

In re Marriage of Braunling, 381 Ill. App. 3d 1097, 1102 (2008). Pursuant to the statutory maxim expressio unius est exclusio alterius, " '[w]here a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions.' " Application of the County Treasurer & ex-officio County Collector, 378 Ill. App. 3d 842, 850-51 (2007), quoting Bridgestone/Firestone, Inc. v. Aldridge, 179 Ill. 2d 141, 151-52 (1997).

The Act, in its current form, provides:

"If a dog or other animal, without provocation, attacks, attempts to attack, or injures a person who is peaceably conducting himself or herself in any place where he or she may lawfully be, the owner of such dog or other animal is liable in civil damages to such person for the full amount of the injury proximately caused thereby." 510 ILCS 5/16 (West 2006).

Plaintiffs correctly observe that the Act does not specifically provide for or reference a comparative negligence defense. Accordingly, plaintiffs invoke the statutory maxim expressio unius est esclusio alterius and contend that pursuant to the plain language of the Act, a defendant is confined to disputing whether the plaintiff's conduct at the time of the injury met the requirements of the Act. Specifically, plaintiffs assert that "[t]he Act expressly sets forth the conduct that it requires of the plaintiff, to wit: that he or she conduct himself or herself peaceably," and accordingly, that the animal's attack occurred "without provocation," and thus a defendant is limited to disputing those elements.

Initially, we disagree that a statute's failure to specifically provide for an affirmative defense necessarily precludes the availability and application of that defense. Indeed, reviewing

16

courts have held that the Act, which is in derogation of common law (Harris v. Walker, 119 Ill. 2d 542, 546-47 (1988)),  is not a strict liability statute and thus does not impose strict liability on animal owners whose animals inflict injuries upon others.  See Smith v. Lane, 358 Ill. App. 3d 1126, 1135 (2005) (recognizing that "courts have not construed the Animal Control Act to impose strict liability"); Meyer v. Naperville Manner, Inc., 262 Ill. App. 3d 141, 143 (1994) (same).  Accordingly, in light of the fact that the Act has not been held to impose strict liability, the Second District in Vanderlei v. Heideman, 83 Ill. App. 3d 158 (1980), found that the Act did not preclude application of the common law affirmative defense of assumption of risk, despite the fact that the defense "did not appear as a defense in the statute in any form," reasoning:

> "To preclude a common law defense such as assumption of risks would, in practical effect, impose strict liability without a factual and reasonable basis 'other than as a pure penalty for [horse] ownership.' (Baily v. Bly, (1967), 87 Ill. App. 3d 259, 262.) Nothing in the language of the statute or in the history of the legislation makes it appear that the intent of the statute is to impose strict liability and to abolish the defense of assumption of risk." Vaderlei, 83 Ill. App. 3d at 161-62.

Thereafter, our supreme court confirmed that one who assumes the risk of injury is not entitled to recover under the Act (see Harris v. Walker, 119 Ill. 2d 542, 547-48 (1988)) and it is now well-accepted that "[a] plaintiff who invites the risk that the animal will injure him, or one who explicitly assumes that risk *** may not recover under the Act" (Garcia v. Nelson, 326 Ill. App. 3d 33, 40 (2001)).

Accordingly, in light of the fact that the common law defense of assumption of the risk

Nos. 1-06-2759; 1-07-0029 (Consolidated)

has been recognized as a valid affirmative defense to an action brought pursuant to the Animal Control Act despite the Act's failure to specifically provide for that defense, we disagree that the Act's failure to specifically provide for the affirmative defense of comparative negligence necessarily precludes application of that defense. However, in contrast to the defense of assumption of risk, the defense of comparative negligence is not a common law defense. See generally Barthel v. Illinois Central Gulf R.R. Co., 74 Ill. 2d 213, 221 (1978) (recognizing that statutes in derogation of common law will not be found to abrogate common law affirmative defenses "unless it plainly appears that the intent of the statute is to impose strict liability"). Indeed, while the defense of contributory negligence existed at common law, our supreme court in Alvis v. Ribar, 85 Ill. 2d 1, 28 (1981) abolished the common law defense of contributory negligence, which barred a plaintiff from recovering for her injuries if her negligence contributed to the accident, and adopted the doctrine of comparative negligence, which serves to reduce a plaintiff's damages by the percentage of fault attributed to her. Thereafter, the legislature modified and codified the comparative negligence defense. See Gratzle v. Sears, Roebuck & Co., 245 Ill. App. 3d 292, 295 (1993). Section 2-1116 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1116 (West 1994)) sets forth the defense and provides:

"In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if

18

the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50% of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff." 735 ILCS 5/2-1116 (West 1994).

Plaintiffs correctly observe that the defense of comparative negligence, as codified in section 2-1116 of the Code, does not explicitly apply to actions brought pursuant to the Act; rather, it specifically applies to "actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability." 735 ILCS 5/2-1116 (West 1994).

Defendants neither dispute that the Animal Control Act does not specifically provide for a comparative negligence defense nor that section 2-1116 of the Code does not explicitly apply to actions brought pursuant to the Act. Rather, defendants contend that because the Act permits recovery for an injury caused by an "animal, without provocation" (510 ILCS 5/16 (West 2002)) their comparative negligence affirmative defense was proper because it "went entirely towards provocation."

We find defendants' attempt to equate provocation with negligence unavailing. Indeed, in VonBehren v. Bradley, 266 Ill. App. 3d 446, 449 (1994), the Fourth District rejected the claim that "provocation [under the Animal Control Act] is the equivalent of contributory negligence," explaining:

"Each presents a separate origin of causation and is defined differently. Provocation is defined as follows:

19

'The act of inciting another to do a particular deed.  That which arouses, moves, calls forth, causes, or occasions.  Such conduct or actions on the part of one person towards another as tend to arouse rage, resentment, or fury in the latter against the former, and thereby cause him to do some illegal act against or in relation to the person offering the provocation.' (Black's Law Dictionary 1103 (5th ed. 1979).)

Contributory negligence is defined as:

'Conduct for which plaintiff is responsible amounting to a breach of duty which law imposes on persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributes to injury complained of as a proximate cause.'  Black's Law Dictionary 931 (5th ed. 1979).

Provocation instigates or initiates the acts resulting in harm; in contrast, contributory negligence, by its terms, combines with the actionable negligence of defendant."  VonBehren, 266 Ill. App. 3d at 449-50.

See also Gilman v. Kessler, 192 Ill. App. 3d 630, 642 (1989) (recognizing that "the concepts of provocation and contributory negligence are separate and distinct doctrines").

Like the common law defense of contributory negligence, the defense of comparative fault as set forth in section 2-1116 of the Code (735 ILCS 5/2-1116 (West 1994)) involves consideration of any actionable negligence of the part of the defendant, and is thus similarly distinguishable from provocation.

20

Defendants' argument similarly ignores case law that recognizes that a child under the age of seven is incapable of being negligent but is capable of provocation under the Animal Control Act. Compare Appelhans v. McFall, 325 Ill. App. 232, 236 (2001) (finding that under the tender years doctrine, which states that a child is incapable of negligence if she is younger than seven years old because it is believed that children under the age of seven are incapable of recognizing and appreciating risk, the five-year-old defendant was incapable of negligence) with Nelson v. Lewis, 36 Ill. App. 3d 130, 133-34 (1976) (holding that the 2 1/2-year-old plaintiff who was scratched in the eye by the defendant's dog was not entitled to recover under the Animal Control Act because she provoked the dog when she either fell or stepped on the dog's tail, finding that in Illinois "a young child is not exempted from responsibility for his or her acts which provoke a dog under this statute").

In addition to failing to accord with Illinois case law, we find that defendants' argument fails because equating the defense of comparative negligence with provocation would ultimately lead to an absurd and illogical interpretation of the Act, which permits a plaintiff to recover for the injuries inflicted by the defendant's animal only if the animal attacked "without provocation." 510 ILCS 5/16 (West 2002). If provocation, as used in the Act, were equated with comparative negligence as defendants suggest, then a plaintiff would be afforded an opportunity to recover so long as the plaintiff's provocation did not amount to 51% or more of the proximate cause of her injuries, despite the Act's clear pronouncement that recovery is permitted only in the complete absence of provocation. See generally Navistar International Transportation Corp. v. Industrial Comm'n, 315 Ill. App. 3d 1197, 1207 (2000), quoting People v. Liberman, 228 Ill. App. 3d Ill.

21

App. 3d 639, 647 (1992) (recognizing that when engaging in statutory interpretation, a court should " 'select an interpretation of the statute which leads to logical results and avoids that which would be absurd' ").

Accordingly, we agree that an analysis of the plain language of the Act in combination with the plain language of section 2-1116 of the Code supports plaintiffs' contention that comparative negligence is not a valid defense to actions brought pursuant to the Illinois Animal Control Act. Moreover, we note that plaintiffs' contention that comparative negligence is not a valid defense under the Act finds further support upon reviewing common law causes of action as well as the legislative history of the Act.

The Act was initially passed in 1949 and permitted recovery only for injuries caused by dogs.[4] Harris v. Walker, 119 Ill. 2d 542 (1988); File v. Duewer, 373 Ill. App. 3d 304, 307 (2007). The Act substantially eased the burden on plaintiffs seeking to recover for injuries inflicted by animals. Harris, 119 Ill. 2d at 547; Robinson v. Meadows, 203 Ill. App. 3d 706, 711 (1990). Indeed, at common law, a plaintiff injured by an animal could only recover for her injuries if she showed that the animal had a dangerous disposition of which the owner was aware. Stumps v. Kelley, 22 Ill. 140, 142-43 (1859) (common law case reciting the common law rule that " 'the owner of domestic or other animals not naturally inclined to commit mischief, as dogs,

---

[4] The original version of the Act provided: " 'If a dog, without provocation, attacks or injures any person who is peaceably conducting himself in any place where he may lawfully be' " then the owner of the dog was liable for the injuries inflicted on that person. Beckert v. Risberg, 33 Ill. 2d 44, 46 (1965), quoting Ill. Rev. Stat. 1959, ch. 8, par. 12(d).

horses, and oxen, is not liable for any other injury committed by them to the person or personal property; unless it can be shown that he previously had notice of the animal's mischievous propensity, or that the injury was attributable to some other neglect on his part ***.' [Citation.]"); Vanderlei, 83 Ill. App. 3d at 162. Because a plaintiff had to prove that an animal owner either knew or was negligent in failing to know that his animal had a propensity to inflict injury upon others, the common law defense of contributory negligence was a valid affirmative defense. See Chicago & Alton R.R. Co. v. Kuckkuck, 197 Ill. 304, 309-10 (1902) (explaining that under common law, "[i]t is undoubtedly the rule in this State that if the party injured has been guilty of heedlessly placing himself in the way of a vicious dog with knowledge of its propensities, or has brought the injury upon himself by his own conduct, or his fault has proximately contributed to his injury, such facts will constitute a good defense. This defense, however, depends upon knowledge, and it is only after notice that the public are required to be on their guard to avoid injury"); see also Vanderlei, 83 Ill. App. 3d at 162.

Accordingly, when the Act was initially passed in 1949 its purpose "was modest: to reduce the burden on dog-bite plaintiffs by eliminating the 'one-bite rule'–the common law requirement that a plaintiff must plead and prove that a dog owner either knew or was negligent not to know that his dog had a propensity to injure people." Harris, 119 Ill. 2d at 547. Thereafter, in 1973, the legislature amended the "dog-bite statute" to permit recovery for injuries caused by "other animals." Harris, 119 Ill. 2d at 547. Currently, to recover under the Act for an injury caused by a dog or other animal, a "plaintiff must prove four elements: '(1) an injury caused by an animal owned by the defendant; (2) lack of provocation; (3) the peaceable conduct

23

of the injured person; and (4) the presence of the injured person in a place where he has a legal right to be.' " Smith v. Lane, 358 Ill. App. 3d 1126, 1135 (2005), quoting Meyer v. Naperville Manner, Inc., 262 Ill. App. 3d 141, 147 (1994). Courts have interpreted the Act "to provide coverage *** [only to] plaintiffs who, by virtue of their relationship to the owner of an animal or lack of any such relationship, may not have any way of knowing or avoiding the risk the animal poses to them. This is consistent with the emphasis the statute places on lack of provocation and the plaintiff's peaceable conduct in a place where he is legally entitled to be." File, 373 Ill. App. 3d at 307, citing Harris, 119 Ill. 2d at 547.

Because the Act eliminated the requirement that a plaintiff prove that the animal had a vicious disposition, of which the owner was aware, Illinois courts recognized that the Act essentially "made irrelevant questions of the injured person's contributory negligence (other than provocation)." Nelson v. Lewis, 36 Ill. App. 3d 130, 133 (1976); see also Beckert v. Risberg, 33 Ill. 2d 44, 47 (1965) (holding that the trial court erred in instructing the jury on contributory negligence in the plaintiff's action, which was based in part on the Act, because "negligence was not in issue"); Vanderlei, 83 Ill. App. 3d at 162 (recognizing that "[u]nder the common law negligence action freedom from contributory negligence and assumption of risk were available defenses," but that it could be argued that the Act's "reference to 'provocation' indicated a legislative intent to restrict the proof that defendant [sic] was not contributorily negligent").

We find that under the Act, considerations of comparative fault principles are similarly inapplicable. Accordingly, a plaintiff's contributory fault is only relevant to the extent that it relates to the element of provocation. It is not a defense in and of itself. We thus find that the

24

trial court erred in allowing defendants to assert a comparative negligence defense.

We note that our finding that comparative negligence is not a valid defense under the Act is consistent with the holdings of other jurisdictions interpreting similar statutes that require the absence of provocation to recover for injuries sustained by an animal. For example, in Hill v. Sacka, 256 Mich. App. 443, 666 N.W.2d 282 (2003), the Michigan Court of Appeals found that comparative fault was not a valid defense to an action brought under the Michigan dog-bite statute, which like the Illinois Animal Control Act, places a similar emphasis on lack of provocation. The Michigan statute, in pertinent part, provides:

" 'If a dog bites a person, without provocation while the person is on public property, or lawfully on private property *** of the owner of the dog, the owner of the dog shall be liable for any damages suffered by the person bitten, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness.' " Hill, 256 Mich. App. at 448, 666 N.W.2d at 287, quoting Mich. Comp. Laws Ann. §287.351 (West 2003).

After reviewing the plain language of the Michigan dog-bite statute, the Hill court concluded:

"[The] statute does not allow for consideration of any comparative negligence on the part of the dog-bite victim, excluding possibly where the negligence may relate to the defense of provocation. The dog-bite statute by its clear and unequivocal language does not allow consideration of any negligence or fault, as that term is generally used, on the part of the owner of the dog. If the other considerations contained in the dog-bite statute

are satisfied, there is no liability where provocation exists, and there is liability where provocation is lacking. ***

Fault, outside the context of provocation, is simply not relevant in a dog-bite action pursued under M.C.L. § 287.351." Hill, 256 Mich. App. at 451, 666 N.W.2d at 289.

After finding that fault was irrelevant except to the extent where "fault is intertwined with provocation," the Hill court further explained that "even in that sense, any allocation of fault [pursuant to Michigan's comparative fault statute] would be immaterial and simply not relevant because, if provocation exists, there would be zero liability, and if provocation is lacking, there would be absolute liability." Hill, 256 Mich. App. at 454, 666 N.W.2d at 290.

Similar findings were reached by the Minnesota Supreme Court and the Arizona appellate court when called upon to interpret their respective statutes. See Seim v. Garavalia, 306 N.W.2d 806, 808, 812 (Minn. 1981) (finding that the defense of comparative fault did not apply to actions brought pursuant to the Minnesota dog-bite statute,[5] which allowed a plaintiff to recover for injuries caused by a dog that acted "without provocation"); Toney v. Bouthillier, 129 Ariz. 402, 631 P.2d 557 (1981) (finding that any consideration of fault was irrelevant in action brought

---

[5] The Minnesota dog-bite statute in effect at the time of the opinion, provided: " 'If a dog, without provocation, attacks or injures any person who is peaceably conducting himself in any place where he may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained.' " Siem, 306 N.W.2d at 808, quoting Minn. Stat. §347.22 (1980).

pursuant to the Arizona dog-bite statute,[6] which explicitly provided for the defense of provocation).

Accordingly, based on our review of the plain language and legislative history of the Act as well as relevant case law from Illinois and other jurisdictions, we thus agree with plaintiffs that the trial court erred in allowing defendants to assert comparative negligence as an affirmative defense.

In a related claim, plaintiffs assert that the trial court further erred in instructing the jury on defendants' comparative negligence defense. Defendants, however, suggest that even if the trial court's decision to permit them to assert a comparative negligence defense and to instruct the jury on that defense was erroneous, that error was necessarily harmless.

"In Illinois, the parties are entitled to have the jury instructed on the issues presented, principles of law to be applied, and the necessary facts to be proved to support its verdict." Dillon v. Evanston Hospital, 199 Ill. 2d 483, 505 (2002); Fetzer v. Wood, 211 Ill. App. 3d 70, 74-75 (1991). It is within the discretion of the trial court to determine whether the evidence supports a specific instruction and whether it should be provided to the jury. Schultz v.

---

[6] The Arizona dog-bite statute at the time of the opinion provided, in pertinent part: " 'The owner of a dog, which bites a person when the person is in or on a public place *** is liable for damages suffered by the person bitten, regardless of the former viciousness of the dog or the owner's knowledge of its viciousness,' " and that " '[p]roof of provocation of the attack by the person injured shall be a defense to the action for damages.' " Toney, 129 Ariz. at 404, 631 P.2d at 559, quoting Ariz. Rev. Stat. Ann. §§24-521, 24-523 (West).

27

Nos. 1-06-2759; 1-07-0029 (Consolidated)

Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 283 (2002); Webber, 368 Ill.

App. 3d at 1020-21. The trial court abuses its discretion when it provides unclear and misleading

instructions or the instructions do not fairly and accurately state the law. Dillon, 199 Ill. 2d at

505. However, even if the trial court erred in providing the jury with erroneous instructions, we

will not reverse the judgment unless we can conclude that the error resulted in prejudice to the

appellant. Knight v. Chicago Tribune Co., No. 1-06-0957, slip op. at 17-18 (September 10,

2008); Mackey v. Daddio, 139 Ill. App. 3d 604, 608 (1985), quoting Brooks v. City of Chicago,

106 Ill. App. 3d 459, 466 (1982) (" 'A liberal application of the harmless error doctrine to jury

instruction issues is favored when it appears that the rights of the complaining party have in no

way been prejudiced' ").

In this case, the trial court instructed the jury as follows:

"When I use the word 'negligence' in these instructions, I mean the failing of

doing something which a reasonably careful person would do or the doing of something

which a reasonably careful person would not do under circumstances similar to those

shown by the evidence. The law does not say how a reasonably careful person would act

under those circumstances. That is for you to decide.

When I use the expression 'contributory negligence,' I mean negligence on the

part of the Plaintiff that proximately contributed to the injury. It was the duty of the

Plaintiff Linnea Johnson before and at the time of the occurrence to use ordinary care for

her own safety. A Plaintiff is contributorily negligent if, one, she fails to use ordinary

care for her own safety; and, two, her failure to use such ordinary care is a proximate

28

cause of the injury. The Plaintiff's contributory negligence, if any, which is 50 percent or less of the total proximate cause of the injury or damage for which recovery is sought, does not bar her recovery; however, the total amount of damages to which she would otherwise be entitled is reduced in proportion to the amount of that negligence. This is known as comparative negligence. If the Plaintiff's contributory negligence is more than 50 percent of the total proximate cause of the injury or damage for which recovery is sought, the Defendants shall be found not liable."

The court further instructed the jury that it need only consider defendants' claim that Linnea was negligent if she met her burden of proof under the Act and that defendants bore the burden of proving their affirmative defense. Specifically, the court instructed:

"If you find from all–find from your consideration of all the evidence that the Plaintiff has proved all of the propositions required of the Plaintiff and Defendant has proved–has not proved both of the propositions required of the Defendant, then your verdict should be for the Plaintiff and you will not reduce Plaintiff's damages. If you find from your consideration of all of the evidence that the Defendants have proved both of the propositions required of the Defendants and if you find that the Plaintiff's contributory negligence was more than 50 percent of the total proximate cause of the injury or damage for which recovery is sought, then your verdict should be for the Defendants. If you find from your consideration of all of the evidence that the Plaintiff has proved all the propositions required of the Plaintiff, Defendants have proved both of the propositions required of the Defendants, and if you find that the Plaintiff's

contributory negligence was 50 percent or less of the total proximate cause of the injury or damage for which recovery is sought, then your verdict should be for the Plaintiff and you will reduce the Plaintiff's damages in the manner stated to you in these instructions."

Because we find that the defense of comparative negligence is not a valid defense to a claim brought pursuant to the Act, it thus follows that the trial court erred in instructing the jury on that defense. Nonetheless, because such an error can be harmless, we must determine whether plaintiffs were prejudiced by the instruction.

In this case, the record reflects that both the parties as well as the trial court evidenced confusion as to the distinction between negligence and provocation as well as the relationship between the two defenses. As a result, the jury received instructions in accordance with the Act, including an instruction on the element of provocation, as well as an instruction on the defense of comparative negligence. In pertinent part, the jury was informed that any negligence on the part of Linnea that was deemed to have contributed to more than 51% of her accidence would completely bar recovery.

Indeed, based on the instructions provided to the jury by the trial court, the jury could have delivered a verdict in favor of defendants because it found that plaintiffs failed to prove one of the essential elements of their cause of action under the Act or because plaintiffs did prove their case, but defendants proved that Linnea acted negligently and her negligence constituted more than 50% of the proximate cause of her injury and thus barred her from recovery. See, e.g., Fetzer, 211 Ill. App. 3d at 81 (finding that the giving of an erroneous comparative negligence instruction in the plaintiffs' action under the Illinois Wrongful Death Act and Survival Act was

prejudicial to the plaintiffs because it precluded recovery once it found the deceased 51%

negligent). Neither of the parties requested the jury to complete a special interrogatory. See

Hudson v. City of Chicago, 378 Ill. App. 3d 373, 394-95 (2007), quoting Sommese v. Maling

Brothers, Inc., 36 Ill. 2d 263, 267 (1966) (explaining that " 'the function of a special

interrogatory is to require the jury's determination as to one or more specific issues of ultimate

fact and is a check upon the deliberations of the jury. "Special interrogatories are used for the

purpose of testing the general verdict against the jury's conclusions as to the ultimate controlling

facts." [Citation.]' "). Accordingly, based on the instructions provided and the lack of a special

interrogatory, defendants correctly acknowledge "one can only speculate as to why the jury

rendered the verdict that it did." However, the record is clear that the concept of comparative

negligence permeated the trial. Consequently, we are unable to conclude that the comparative

negligence instruction did not mislead the jury or that the instruction did not result in prejudice to

plaintiffs. Accordingly, we reverse and remand for a new trial.

Because we reverse and remand for a new trial, we will consider plaintiffs' argument that

the trial court erred in allowing defendants' expert, Dr. Jessica Jahiel, to testify about her opinion

that Linnea provoked Gambler. Specifically, plaintiffs contend that Jahiel's testimony was based

on speculation as well as on a definition of provocation that was contrary to Illinois law.

Defendants initially contend that plaintiffs waived their arguments pertaining to Jahiel's

testimony because they failed to object on these specific grounds at trial. Moreover, on the

merits, defendants respond that Jahiel's testimony was not based on speculation nor was it

inconsistent with the legal definition of provocation in Illinois and, accordingly, the trial court

committed no error in permitting her to testify.

As a general rule, "[e]xpert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." Snelson v. Kamm, 204 Ill. 2d 1, 24 (2003); see also Favia v. Ford Motor Co., 381 Ill. App. 3d 809, 816 (2008) ("An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons and where such testimony will aid the trier of fact in reaching its conclusions"). The decision to admit expert testimony is one that lies within the sound discretion of the trial court and, accordingly, we will uphold the trial court's ruling absent an abuse of that discretion. Snelson, 204 Ill. 2d at 24; Noakes v. National R.R. Passenger Corp., 363 Ill. App. 3d 851, 854 (2006).

Because "an expert's opinion is only as valid as the reasons for that opinion," "[a] party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion." Petraski v. Thedos, 382 Ill. App. 3d 22, 28 (2008). Thus, expert testimony that is based on guess, speculation, or conjecture is inadmissible. Dyback v. Weber, 114 Ill. 2d 232, 244 (1986); Torres v. Midwest Development Co., 383 Ill. App. 3d 20, 29 (2008).

Initially, we find that plaintiffs have waived their argument that Jahiel's testimony was improperly admitted because it was based on speculation. Plaintiffs asserted five objections during the course of Jahiel's testimony. At no time in the trial court did plaintiffs object to Jahiel's testimony based on the purported speculative basis of her testimony. See Mikolajczyk v. Ford Motor Co., 374 Ill. App. 3d 646, 674 (2007), quoting Land & Lakes Co. v. Industrial

32

Comm'n, 359 Ill. App. 3d 582, 596 (2005) (Donovan, J., specially concurring) (" '[a] party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in waiver of objections as to all other grounds not specified or relied on' "). Although plaintiffs filed a motion in limine seeking to prevent Jahiel from "[d]irectly or indirectly disclosing, discussing or suggesting in any manner *** that the horse Gambler was provoked since [she] does not know what the plaintiff was doing at the time of the kick," plaintiffs failed to object to Jahiel's testimony on the grounds of speculation at trial and thus failed to properly preserve this issue for appeal. See Jones v. Rallos, 384 Ill. App. 3d 73, 83 (2008) ("When a motion in limine is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review"); see also Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co., 163 Ill. 2d 498, 502 (1994) (finding that the appellants waived their right to challenge evidence on appeal because they failed to object to the evidence at trial after their motion in limine was denied).

Moreover, on the merits, we do not find that Jahiel's testimony was improperly admitted because it was based on speculation. At trial, she indicated that she examined the deposition transcripts of the Johnson defendants, Linnea and her father, as well as the two owners of Top Brass, the contents of which she used to formulate her opinions. Based on her review of the aforementioned materials, Jahiel opined that Linnea provoked Gambler by entering his kick zone without announcing her presence. She found it especially relevant that both David and William Johnson testified at their depositions that neither they nor their horses had moved prior to Linnea's accident, explaining that their testimony was "important *** because according to their

33

own testimony, neither gentleman had moved, neither horse had moved; and, yet, a child had been kicked by the horse that wasn't previously moving. So at some point the child had to come into the kick zone, so the child had to move." Although plaintiffs correctly note that Jahiel did not know precisely what Linnea was doing at the time of her accident and, accordingly, had no opinion as to whether Linnea was walking, bending, crouching, or kneeling, at the time of the kick, we disagree that her ultimate conclusion that Linnea entered the kick zone without announcing her presence was based on speculation. Accordingly, we find plaintiffs' argument that Jahiel's testimony was improperly admitted because it was based on speculation to be without merit.

Plaintiffs also contend that the trial court erred in allowing Jahiel to testify and deliver her opinion that Linnea provoked Gambler by entering the kick zone without alerting Gambler to her presence because her definition of provocation did not accord with the legal definition of the term. Initially, we find that plaintiffs have waived their argument that Jahiel's testimony was improper because it was based on an erroneous definition of "provocation," as that term is defined in Illinois. Plaintiffs never objected to Jahiel's use of the term "provocation" at trial or to her opinion that Linnea provoked Gambler by exiting the kick zone without alerting Gambler to her presence. LaSalle Bank, N.A. v. C/HCA Development Corp., No. 1-06-1859, slip op. at 31 (August 4, 2008) (recognizing that to properly preserve an issue for appeal "a party must object specifically both at trial and in a posttrial motion," and that failure to do either waives review of that issue on appeal). Moreover, although plaintiffs filed a motion in limine to prevent Jahiel from testifying "that the horse Gambler was provoked since her definition of the term as

34

Nos. 1-06-2759; 1-07-0029 (Consolidated)

disclosed in her deposition testimony does not reflect the law in the State of Illinois as to the

meaning of that term under the Animal Control Act," their failure to object to her use of the term

"provocation" at trial served to waive review of this issue on appeal. See Illinois State Toll

Highway Authority, 163 Ill. 2d at 502.

Notwithstanding waiver, we do not find that Jahiel's testimony should have been

excluded because her definition of provocation was inconsistent with the legal definition of that

term.

Illinois Pattern Jury Instructions, Civil, No. 110.04 (2006) (hereinafter IPI Civil (2006)

No. 110.04) defines provocation as follows:

> "The term 'provoked' means any action or activity, whether intentional or
>
> unintentional, which would reasonably be expected to cause a normal animal in
>
> similar circumstances to react in a manner similar to that shown by the evidence."

At trial, Jahiel provided testimony about the nature and instinctive responses of horses,

including their kick response. In pertinent part, she indicated that horses are prey animals that

react instinctively to predator behavior. Jahiel further testified that "an altogether too common

way of provoking a horse to kick out" was for a person to approach the horse in its blind spot

without alerting the horse to her presence. She acknowledged that a horse will not kick out every

time in response to such stimuli, but acknowledged that such a response was reasonably

expected. On cross-examination, plaintiffs counsel asked Jahiel whether she was aware of the

legal definition of the term "provocation," as that term is defined by IPI Civil (2006) No. 110.04,

and she indicated that she was not. Thereafter, plaintiffs counsel queried: "Would it be fair to

35

say that your definition of provocation includes any stimulus?" Jahiel responded affirmatively, indicating that her definition of provocation was "[a]ny stimulus that elicits an instinctive response on the part of the horse, yes."

Although Jahiel's definition of the term "provocation" does not explicitly match the legal definition, we do not find that the trial court erred in allowing Jahiel to testify. Moreover, we do not find that her testimony prejudiced plaintiffs as the jury received the pertinent instruction reflecting the precise legal definition of provocation.

Finally, plaintiffs suggest that the trial court should have excluded Jahiel's testimony because her opinion was not adequately disclosed prior to trial as required by Supreme Court Rule 213 (210 Ill. 2d R. 213).

Supreme Court Rule 213(f)(3) requires parties to disclose, prior to trial, the opinions and conclusions of their retained expert witnesses. 210 Ill. 2d R. 213(f)(3). Specifically, the rule requires parties to "identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." 210 Ill. 2d R. 213(f)(3). Rule 213(g), in turn, limits the testimony that an expert witness may provide at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or at deposition." 210 Ill. 2d R. 213(g); Foley v. Fletcher, 361 Ill. App. 3d 39, 46 (2005). Rule 213 reflects the supreme court's best efforts to "manage the complex and important process of discovery" in a manner that allows the parties to formulate their trial strategies and avoids surprises and tactical gamesmanship. Sullivan v. Edward Hospital, 209 Ill. 2d 100, 109 (2004); see also Foley, 361 Ill. App. 3d at 46.

36

Rule 213's disclosure requirements are mandatory and require strict compliance by the parties. Sullivan, 209 Ill. 2d at 109; Clayton v. County of Cook, 346 Ill. App. 3d 367, 377 (2003). The admission of evidence in accordance with Rule 213 lies within the sound discretion of the trial court and, accordingly, we will uphold the trial court's ruling absent an abuse of that discretion. Sullivan, 209 Ill. 2d at 109; Matthews v. Avalon Petroleum Co., 375 Ill. App. 3d 1, 10 (2007).

In this case, prior to trial, defendants provided plaintiffs with a written copy of Jahiel's opinion. In her opinion, Jahiel discussed the nature of horses, and indicated that "they are nervous, sensitive, and extremely quick to react to a stimulus." Specifically, Jahiel indicated that "[a] horse's natural, defensive reaction to a perceived danger from behind is to kick. When someone or something approaches a horse in silence, especially if it approaches from directly behind where it is in the horse's 'blind spot' and therefore invisible to the horse, that someone or something is exhibiting predator behavior." Accordingly, "kicking out in reaction to a perceived predator is a natural prey behavior, and a natural and predictable expression of the horse's surprise and fright." Jahiel indicated that a horse's kick response was "very likely," and that Gambler's response in this case "would not surprise anyone familiar with horses and their nature and instincts."

Thereafter, at trial, Jahiel provided testimony consistent with her prior disclosed opinion, explaining that horses were prey animals and that when a person approached a horse from behind without alerting the horse to her presence, the person exhibited "predator" behavior, which would "probably provoke a reaction" in the horse. On direct examination, Jahiel was asked: "Okay. So it could reasonably be expected for a horse to kick out if it had a–there was a stimulus where

37

someone came from the blind spot and out of the blind spot." Plaintiffs' attorney objected, arguing that the term "reasonably expected" was "not [in the] phraseology of any [previously disclosed] opinion." The court overruled the objection, and Jahiel responded to the question affirmatively, indicating "Yeah, that's a likely scenario."

Plaintiffs, however, contend that the trial court should have sustained their objection because Jahiel's opinion that she would "reasonably expect" a horse to kick when someone approached the horse from behind in its blind spot was not disclosed prior to trial. Although plaintiffs are correct that the specific term "reasonably expected" was not included in Jahiel's written opinion that defendants disclosed prior to trial, the substance of her opinion remained consistent. Indeed, in her written opinion, she indicated that such a horse's kick response was "a natural and predictable expression of the horse's surprise and flight." Jahiel's testimony in no way constituted a surprise to plaintiffs. Accordingly, we find that the trial court did not abuse its discretion in overruling plaintiffs' objection.

Plaintiffs next contend that the trial court erred in failing to grant their motion for a directed verdict on the issue of liability and, thus, assert that the new trial to which they are entitled is a trial on the issue of damages alone. Because we are remanding for a new trial, we will consider this issue.

A motion for a directed verdict is properly granted when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on the evidence could ever stand.' " Jones v. Rallos, 384 Ill. App. 3d at 82, quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967). Accordingly, if

" 'there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome' " then a motion for a directed verdict should be denied. Jones, 384 Ill. App. 3d at 82, quoting Maple v. Gustafson, 151 Ill. 2d 445, 454 (1992). Our review is de novo. Lisowski v MacNeal Memorial Hospital Ass'n, 381 Ill. App. 3d 275, 289 (2008).

As previously discussed, for a plaintiff to prevail on her claim brought pursuant to the Animal Control Act, she must prove: " '(1) an injury caused by an animal owned by the defendant; (2) lack of provocation; (3) the peaceable conduct of the injured person; and (4) the presence of the injured person in a place where he has a legal right to be.' " Smith, 358 Ill. App. 3d at 1135, quoting Meyer, 262 Ill. App. 3d at 147. At trial, the only element disputed by the parties was the presence or lack of provocation. Plaintiffs contend that there is no evidence that Linnea provoked Gambler and, thus, they were entitled to a directed verdict on liability.

Illinois courts have defined the term "provocation" as " 'an act or process of provoking, stimulation[,] or incitement.' " Kirkham v. Will, 311 Ill. App. 3d 787, 791 (2000), quoting Nelson, 36 Ill. App. 3d at 131. Provocation may be intentional or unintentional. Nelson, 36 Ill. App. 3d at 133 ("A determination of provocation does not require consideration of the degree of wilfulness which motivates the provoking cause"). Whether an animal is provoked under the Animal Control Act is not judged from the perspective of the plaintiff; rather, "it is the reasonableness of the [animal's] response to the action in question that actually determines whether provocation exists." Kirkham, 311 Ill. App. 3d at 791; see also Meyer, 262 Ill. App. 3d

39

at 149 ("a determination of provocation does not depend on the subjective intent of the plaintiff").

In this case, although both William and David Johnson were present when Linnea was kicked by Gambler, neither William nor David saw the actual kick. Similarly, neither man saw what Linnea was doing immediately preceding the kick. Linnea testified that she went to retrieve a grooming tool located in tack box next to the hay barn. According to Linnea, the tack box was not behind Gambler; rather, it was located slightly off to the side of Gambler. As she was getting the brush, Linnea heard Gambler's feet shuffle, and immediately thereafter, she was kicked. Linnea denied that she was behind Gambler at the time of the kick.

Plaintiffs contend that since Linnea's trial testimony was not impeached, it must have been accepted as true and that her testimony provides no evidence of provocation and thus they were entitled to a directed verdict on liability. See Smith v. Pitchford, 219 Ill. App. 3d 152, 155 (1991) ("Where *** the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury"). Plaintiffs, however, ignore that Linnea was impeached by her prior deposition testimony. Indeed, at her deposition, Linnea provided a different account of the kick. She originally testified that Gambler had been facing her when she was kicked; however, the testimony of Dr. Jahiel refuted the possibility of such an occurrence as she indicated that a horse cannot kick forward, only backward. Moreover, Linnea's father confirmed that Linnea had not been in front of the horse when the kick occurred. In addition, Linnea's account of where she retrieved the horse grooming brush and what she was

40

doing immediately prior to the accident was contradicted by the testimony provided by Ramona Johnson. While Linnea indicated that she went to retrieve a grooming tool from the tack box located near the wall of the barn, Ramona testified that shortly before the kick, Linnea had walked into the barn and Ramona had provided her with the brush. Thereafter, Linnea left the barn with the grooming tool, and shortly thereafter, she was kicked. Accordingly, based on the different accounts of the incident, we do not find that the trial court erred in denying plaintiffs' motion for a directed verdict.

Plaintiffs, nonetheless, citing Smith v. Pitchford, 219 Ill. App. 3d 152 (1991), contend that even if Jahiel's testimony was believed and Linnea did walk behind the horse, "walking behind a horse is not provocation as a matter of law," and thus they were still entitled to a directed verdict. In Smith, an eight-year-old boy was petting the defendant's dog, with whom he had interacted with on a prior visit to the defendant's home, when the dog jumped up and bit the plaintiff in the face, causing permanent facial scarring. Appealing a jury verdict in favor of the defendant, the plaintiff contended that he was entitled to a judgment notwithstanding the verdict on the question of liability in part because there was no evidence that he provoked the defendant's dog. The Fifth District agreed, finding that the plaintiff's actions in simply petting the dog did not constitute provocation, explaining:

"Mere presence on private property does not constitute provocation regardless of how the animal may interpret the visitor's movements. [Citation.] Provocation cannot be said to exist within the meaning of section 16 of the Animal Control Act [citation] where such unintentional stimuli as greeting or petting a dog result in the dog attacking the plaintiff

41

Nos. 1-06-2759; 1-07-0029 (Consolidated)

viciously and the attack is 'out of all proportion to the unintentional acts involved.'

(Robinson v. Meadows, (1990), 203 Ill. App. 3d 706, 713 ***.)" Smith, 219 Ill. App. 3d

at 154.

Plaintiffs contend that based on Smith, "an animals [sic] misinterpretation of a plaintiff's

peaceable movements cannot in and of itself constitute provocation" and that, in this case, the

kick was necessarily caused by Gambler's misinterpretation of Linnea's peaceable movements.

We do not find that Smith supports plaintiffs' contention that they were entitled to a directed

verdict on the question of liability and that a new trial should be conducted on the issue of

damages alone.

Provocation in this case must be considered from the perspective of a "normal" horse.

Kirkham, 311 Ill. App. 3d at 793-94 (recognizing that Illinois courts "have focused on

provocation from the perspective of the animal. The cases tend to focus on how an average dog

[or other animal], neither unusually aggressive nor unusually docile, would react to an alleged act

of provocation"). In this case, there was ample evidence that entering a horse's blind spot

without first announcing one's presence was dangerous and could result in a kick. Jahiel

indicated that horses are prey animals and that a person approaching the horse from behind

without alerting the horse to her presence exhibited predator behavior and, accordingly, a horse

was likely to kick in response to such stimuli. Moreover, William, David, and Linnea all

confirmed that entering a horse's blind spot without announcing one's presence was dangerous,

as a horse may kick. Such testimony supports the conclusion that it is normal for a horse to kick

in response to a person entering the horse's kick zone from its blind spot without first

42

announcing her presence. Because the testimony presented at trial showed that a normal horse would kick in response to being silently approached from behind, such behavior can be found to constitute provocation under the Animal Control Act. Moreover, it could be disputed whether a single kick can be considered a vicious attack that is disproportionate to the act involved. Accordingly, because there was evidence with which a fact finder could find the existence of provocation, we do not find that the trial court erred in denying plaintiffs' motion for a directed verdict, and thus they are not entitled to a new trial on the issue of damages alone.

Ultimately, because we find that plaintiffs are entitled to a new trial, we need not consider their alternative argument that the jury's verdict was against the manifest weight of the evidence.

We now address the argument raised in defendants' cross-appeal. Defendants assert that the trial court erred when it found that the settlement between plaintiffs and third-party defendant David Johnson was made in good faith as required by the Contribution Act.

The Contribution Act, enacted in 1979, provides for the statutory right of contribution in actions "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death." 740 ILCS 100/2(a) (West 2006). Specifically, the Contribution Act permits one tortfeasor "who has paid more than his pro rata share of the common liability" to recover "the amount paid by him in excess of his pro rata share." 740 ILCS 100/2(b) (West 2006). In addition to providing for contribution, the Contribution Act also contemplates settlement. See Johnson v. United Airlines, 203 Ill. 2d 121, 133 (2003) (recognizing that "the Contribution Act seeks to promote two important public policies–the encouragement of settlements and the equitable apportionment of damages among tortfeasors").

43

Nos. 1-06-2759; 1-07-0029 (Consolidated)

Section 2(c) of the Contribution Act provides:

"When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater." 740 ILCS 100/2(c) (West 2006).

A tortfeasor who settles in accordance with the requirements of section 2(c) of the Contribution Act "is discharged from all liability for any contribution to any other tortfeasor." 740 ILCS 100/2(d) (West 2006). " '[G]ood faith' *** is the only limitation which the [Contribution Act] places on the right to settle and it is the good-faith nature of a settlement that extinguishes the contribution liability of the settling tortfeasor." Johnson, 203 Ill. 2d at 128. The Contribution Act, however, does not define the term "good faith." Johnson, 203 Ill. 2d at 128; Dubina v. Mesirow Realty Development, Inc., 197 Ill. 2d 185, 191 (2001). Nonetheless, "our supreme court has noted that a settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud. [Citation.] Nor will a settlement satisfy the good-faith requirement if it conflicts with the terms of the [Contribution] Act or is inconsistent with the policies underlying the [Contribution] Act." Pecoraro v. Balkonis, 383 Ill. App. 3d 1028, 1038 (2008).

The settling parties bear the initial burden of showing the existence of good faith and,

44

thus, must show "[a]t a minimum *** the existence of a legally valid settlement agreement." Johnson, 203 Ill. 2d at 132. Thereafter, once the settling parties make a preliminary showing of good faith, the party seeking to challenge the agreement must prove the absence of good faith by the preponderance of the evidence. Johnson, 203 Ill. 2d at 132. "A settlement will not be found to be in good faith if it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud." Johnson, 203 Ill. 2d at 134. Ultimately, the trial court must examine the totality of the circumstances to determine whether a settlement agreement complies with the Contribution Act's good-faith requirement (Dubina, 197 Ill. 2d at 191), and we will uphold the trial court's determination absent an abuse of discretion (Johnson, 203 Ill. 2d at 135; Yoder v. Ferguson, 381 Ill. App. 3d 353, 390 (2008)). An abuse of discretion exists only where we can conclude that the trial court's ruling is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the same view." Favia v. Ford Motor Co., 381 Ill. App. 3d 809, 815-16 (2008), citing People v. Illgen, 145 Ill. 2d 353, 364 (1991).

In this case, David Johnson's motion for a good-faith finding set forth the existence and terms of the settlement agreement, including valid consideration. He further represented that there was no evidence that he negligently supervised his daughter. At this point, the burden shifted to the Johnson defendants to show that the settlement was not made in good faith. See Johnson, 203 Ill. 2d at 135; Pierre Condominium Ass'n v. Lincoln Park West Associates, LLC, 378 Ill. App. 3d 770, 779 (2007); Wreglesworth v. Artco, Inc., 317 Ill. App. 3d 628, 634 (2000). The trial court found that the Johnson defendants failed to meet this burden, and we cannot conclude that court's decision was an abuse of discretion.

45

On appeal, the Johnson defendants advance the same argument contesting that lack of good faith as they did in the trial court. Specifically, they contend that the settlement was "inherently flawed" because it was a "disminimus [sic] settlement among family members." The Johnson defendants assert that plaintiffs had originally demanded $650,000 to settle the case and that third-party defendant David Johnson settled for "a mere nuisance amount of $7,500."

Initially, we note that the Johnson defendants provide no citation to the record to substantiate their claim as to plaintiffs' prior settlement demands. Moreover, there is nothing in the record pertaining to plaintiffs' prior settlement demands. As the cross-appellants, the Johnson defendants bear the burden of providing a sufficiently complete record to allow for meaningful appellate review of their claim. Cardona v. Del Granado, 377 Ill. App. 3d 379, 386 (2007), citing Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984). In the absence of such a record, we will presume that the trial court's order was entered in conformity with the law and was supported by a sufficient factual basis. Cardona, 377 Ill. App. 3d at 386.

Notwithstanding the lack of evidence in the record to support defendants' claim as to plaintiffs' prior settlement demand, we note that the disparity between the settlement amount to an amount previously sought is "not an accurate measure of the good faith of a settlement." Johnson, 203 Ill. 2d at 136-37 (upholding the trial court's good faith finding as to "nominal" settlement amount even though the plaintiffs had initially sought to recover millions of dollars of damages in their complaint). Similarly, the small size of a settlement, alone, is not a indication of bad faith because it is well established that " ' "settlements may be substantially different from the results of litigation because damages are often speculative and the probability of liability

46

uncertain." ' " Wreglesworth, 317 Ill. App. 3d at 643, quoting Alvarez v. Fred Hintze Construction, 247 Ill. App. 3d 811, 816 (1993), quoting Smith v. Texaco, Inc., 232 Ill. App. 3d 463, 469 (1992). Accordingly, rather than looking at the size of the settlement itself, "[t]he amount of a settlement must be viewed in relation to the probability of recovery, the defenses raised, and the settling party's potential legal liability." Johnson, 203 Ill. 2d at 137.

In this case, the Johnson defendants filed a third-party complaint against David Johnson, asserting that David negligently supervised and instructed Linnea and that his negligent actions contributed to her injuries. However, because comparative negligence is not a valid defense under the Animal Control Act, any consideration of the potential negligence on the part of David, a third-party defendant, would be irrelevant. See, e.g., Hill, 256 Mich. App. at 451-52, 666 N.W.2d at 289 (finding that because comparative negligence was not a valid defense under the Michigan dog-bite statute, it was "a necessarily corollary *** that the fault or negligence of a third person, i.e., not the dog owner or the direct victim of the dog bite, is likewise not relevant. The statute does not allow for such consideration, nor would it be reasonable to conclude that the third person's negligence is relevant where the negligence of the dog-bite victim who is seeking money damages is not to be considered"). Moreover, there is no evidence that David was negligent as there is nothing in the record to show a need for him to constantly supervise Linnea. See Campbell v. Haiges, 152 Ill. App. 3d 246, 252 (1987) (recognizing that parents are under no duty to supervise their children at all times and are not negligent in failing to do so absent "specific facts showing a special need for caution"). Accordingly, because any purported negligence on the part of David is irrelevant and there is no evidence that David acted

negligently, we do not find that the small $7,500 settlement is indicative of bad faith.

In addition to finding fault with the amount of the settlement, defendants emphasize the familial relationship between plaintiffs and third-party defendant David Johnson.

Although the relationship between the settling parties is a relevant consideration in determining whether a settlement was made in good faith (see generally Pierre Condominium Ass'n v. Lincoln Park West Associates, LLC, 378 Ill. App. 3d 770, 779 (2007); Wreglesworth v. Arctco, Inc., 317 Ill. App. 3d 628, 634 (2000)), a close relationship itself is not sufficient to show collusion and establish bad faith. See, e.g., Bryant v. Perry, 154 Ill. App. 3d 790 (1986) (upholding a mother's settlement with her daughter where mother was acting as her daughter's representative and was named a counterdefendant in the daughter's personal injury action); Wasmund v. Metropolitan Sanitary District of Greater Chicago, 135 Ill. App. 3d 926, 930 (1985), *abrogated on other grounds by* Johnson, 203 Ill. 2d at 130 (upholding a settlement reached between a plaintiff and a third-party who was her friend at the time of the settlement and became her husband at a later date, reasoning "[w]e do not believe that the fact that the two were friends is sufficient, without more, to taint the settlement with an indicia of collusion"). Although defendants point to the familial relationship between plaintiffs and David Johnson, they provide no evidence that the parties engaged in collusion, and, accordingly, we find that their unsubstantiated claim of collusion has no merit. Indeed, based on the facts in the record, we cannot conclude that the trial court abused its discretion in finding that the settlement agreement between plaintiffs and David Johnson was reached in good faith.

For the foregoing reasons, we find that the trial court erred in allowing defendants to

assert a comparative negligence defense to plaintiffs' claim brought under the Animal Control Act and further erred in instructing the jury on that defense. Because we are unable to conclude that the error was harmless, we reverse and remand for a new trial. However, we affirm the trial court's order finding that the settlement agreement reached between plaintiffs and third-party defendant David Johnson was reached in good faith and, accordingly, David's contribution liability is extinguished during the new trial.

Affirmed in part and reversed in part; cause remanded for a new trial.

THEIS, J., and QUINN, J., concur.