FOURTH DIVISION
MARCH 31, 2008

No. 1-06-2127

| | | |
|---|---|---|
| VITO FAVIA, Administrator of the Estates of | ) | Appeal from the |
| Nicholas Favia, Deceased, and Rosa Favia, Deceased; | ) | Circuit Court of |
| CATERINA FAVIA, Special Administrator of the Estate | ) | Cook County. |
| of Patricia Favia, Deceased, and Michael Favia, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | No. 00 L 10755 |
| | ) | |
| v. | ) | |
| | ) | |
| FORD MOTOR COMPANY, a Corporation, | ) | Honorable |
| | ) | James P. Flannery, Jr., |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs Vito Favia, as administrator of the estates of Nicholas and Rosa Favia, Caterina Favia as the special administrator of the estate of Patricia Favia, and Michael Favia, individually, appeal a jury verdict entered in favor of defendant Ford Motor Co. in a products liability action arising out of a single-vehicle rollover crash. On appeal, plaintiffs argue that the trial court erred in: (1) admitting police testimony concerning the cause of the crash; (2) admitting expert opinions based on statistical data not produced by defendant to plaintiffs; and (3) denying plaintiffs' motion to deem facts admitted. Plaintiffs also argue that the cumulative effect of the above errors denied them a fair trial.

The record on appeal discloses the following facts. At approximately 4:30 a.m. on September 18, 1994, plaintiff and his decedents were passengers in a Ford Aerostar Extended

(Aerostar) driven by Sebastiano Partipilo, headed west on Interstate 74 outside Greenburg, Indiana. The vehicle was driving in the left lane through a construction zone. Orange barrels separated the left lane from the right lane, which was undergoing repaving. The right lane was approximately five inches lower than the left.

United States Army Major Jeffrey Gorres, traveling behind the Aerostar, testified at trial that while traveling at approximately 60 miles per hour, Partipilo allowed the right side tires to drop into the unpaved right lane. The Aerostar crashed into construction barrels as it went. Partipilo maneuvered the Aerostar out of the right lane, but after overcoming the drop-off, the vehicle was rocking back and forth, continuing left across the lane into the dirt median. Partipilo then steered sharply to the right, causing the Aerostar to be perpendicular to the direction of travel. Major Gorres saw sparks as the left front wheel rim contacted the pavement. The Aerostar then rolled over four or five times before coming to rest along the right side of the road.

Plaintiff and his decedents were thrown from the vehicle. Plaintiff Michael Favia suffered injuries that left him legally blind, while Patricia, Nick and Rosa Favia were killed.

Major Gorres stopped his car to check the severity of the injuries then drove to a nearby gas station to telephone for emergency assistance. Within minutes of the call, emergency assistance arrived, including firefighters and paramedics. Decatur County sheriff's deputy Robert Ewing began to investigate the crash scene and obtained assistance from Indiana State Police Sergeant Daniel Goris. The testimony of Deputy Ewing and Sgt. Goris was presented to the jury via edited copies of their videotaped evidence depositions.

Deputy Ewing had worked in law enforcement since 1991. He studied accident investigation at the Indiana Law Enforcement Academy, with an additional 40-hour reserve

deputy course in accident investigation and further training at the Indiana State Police School. Deputy Ewing estimated that since 1991, he had investigated, on average, 75 crashes annually, including rollovers on the interstate with ejected passengers.

Sgt. Goris started in law enforcement as a road deputy in 1976. Goris testified that he attended 80 hours of crash investigation school and 40 hours of advanced technical crash investigation. As a technical crash investigator, he had investigated numerous crashes, including interstate rollovers with ejected passengers.

Neither Deputy Ewing nor Sgt. Goris had training in mechanical engineering, automotive engineering, vehicle dynamics or kinematics, or accident reconstruction. Working together, Deputy Ewing and Sgt. Goris made notations and took measurements with respect to the tire marks and other markings on the road, the location of the vehicle and the injured and deceased passengers. Based on these notes and measurements, Sgt. Goris prepared a diagram that was included in Deputy Ewing's report on the crash.

Deputy Ewing testified that Partipilo's over-steering was the primary cause of the crash, with the unlevel pavement being a contributing cause of the crash. Sgt. Goris opined that Partipilo over-steered, but that it was Partipilo allowing the right-side tires to drop into the unpaved right lane that caused the crash. On cross-examination, both Deputy Ewing and Sgt. Goris testified that they had no training in mechanical engineering, automotive engineering, vehicle dynamics or kinematics, or accident reconstruction. Sgt. Goris testified that he had no opinion as to whether the design of the vehicle might have been an additional cause of the accident.

Plaintiffs presented a number of expert witnesses regarding the design and safety of the Aerostar. David Bilek, who held a degree in mechanical engineering technology, testified regarding the vehicle's "static stability factor," the relationship between a vehicle's center of gravity and its track width. Bilek testified that the Aerostar Extended's length decreased its static stability factor because its width remained the same. The vehicle has a lower static stability factor than passenger cars, and it decreases when it is fully loaded. Bilek opined that Partipilo's steering was reasonably foreseeable to Ford and that the design was defective because the center of gravity was too high under such conditions. On cross-examination, Bilek testified that a vehicle is not defective simply because it has a different rollover potential from other cars, and that one cannot predict whether a vehicle will rollover based only on its static stability factor.

Milton Chase, Ph.D., testified that in the 1960s, he began work on a computer software package for modeling vehicle systems called Automated Dynamic Analysis of Mechanical Systems (ADAMS). The software applies vehicle properties and the laws of physics to create a computer model of a vehicle and perform computerized testing of its behavior. The system is used by automobile manufacturers, including Ford.

Dr. Chase testified to his development of ADAMS simulations of the Aerostar's performance of J-turns and of the rollover at issue in this case. Dr. Chase testified that the vehicle, when loaded to its gross weight limit, tipped up on its side wheels when performing J-turns. Dr. Chase opined that the Aerostar was unreasonably dangerous because it had inadequate resistance to rollover when fully loaded.

On cross-examination, Dr. Chase admitted that his computer simulation of the rollover here did not match as to where the vehicle came to rest. Dr. Chase also doubted that he had used

4

the same ADAMS model as Ford had. Dr. Chase admitted that he acquired his tire data for the simulations from a slow-speed test while Ford used tire data collected at 55 miles per hour. Dr. Chase also admitted that a safely designed car can roll over for many reasons.

Statistician Randall Whitfield performed an analysis of data from the Fatality Analysis Reporting System (FARS) concerning crashes with one or more similarities to the crash at issue in this case. Whitfield's analysis showed that in four different categories, the Aerostar's involvement in rollover crashes was greater than that of peer vehicles, opining that this was due to the design of the vehicle. On cross-examination, Whitfield agreed that even a safely designed vehicle can roll over given some sort of tripping. He also admitted that he excluded certain vehicles lacking a driver-side airbag from his study, which tends to skew the results against vehicles which have that airbag, like the Aerostar.

Ford also presented a number of expert witnesses regarding the design and safety of the Aerostar. Donald Tandy, a former Ford employee and engineering consultant on crash investigation and vehicle development, helped design the Aerostar Extended model. Tandy's duties included validating the ADAMS model, which includes correlating the model with real world, on-track testing at various load weights on wet and dry pavement. Tandy also validated the results of Ford's ADAMS J-turn simulations.

Tandy opined that ADAMS is not an appropriate tool for reconstructing real world accidents. Tandy also opined that Dr. Chase had not adjusted his computer model to reflect the specific age and characteristics of the actual vehicle in this case. Tandy also criticized specific aspects of Dr. Chase's reconstructions. For example, Tandy noted that Dr. Chase modeled the ledge between the right and left lanes of the highway as a 45-degree ramp, rather than the vertical

drop mentioned in the eyewitness testimony. Tandy testified that the computer program crashed when he modified it to reflect the vertical drop. Tandy further testified that the difference in the tire data did not correlate to the real-world performance of the Aerostar. Tandy additionally noted that the simulation did not account for differences in friction that would occur on the dirt and grass surface of the median.

Lee Carr, another former Ford employee and engineering consultant, had over 20 years of experience investigating rollover crashes. Carr opined that neither the Aerostar's steering nor stability systems caused the accident. Carr explained how the various markings and measurements noted by the police allowed him to calculate the vehicle's speed and roll sequence. Car testified that only one second elapsed from the time the Aerostar returned to the pavement and the time it entered the grassy median. Carr opined that this showed over-steering and that the vehicle could not stabilize itself in one second from the bouncing occurring from surmounting the five-inch drop. Carr testified that once the vehicle made contact with the median, Partipilo reversed his steering, the vehicle slid clockwise, causing weight to shift inside the vehicle. The rear and left front tires added force, digging into the dirt of the median. As the left front tire attempted to clear the median and reenter the pavement, the rim struck the pavement and the vehicle began to roll within two-thirds of a second, slowing to 51 miles per hour and rolling four times.

Carr further opined that the static stability factor is too simplistic a method for determining a car's risk of rollover. Carr testified that Ford and other automobile companies use industry standards of likely lateral forces placed by drivers on vehicles. Generally, crash avoidance

maneuvers will measure 0.5 times the force exerted by Earth's gravity ("G"). Carr testified that his testing of the Aerostar was fully comfortable on dry roads up to at least 0.8 Gs.

Michelle Vogler, Ph.D., who holds bachelor, master and doctorate degrees in mechanical engineering, testified that her consulting firm concentrates on risk analysis and accident statistics of motor vehicles. Dr. Vogler testified that, based on data from the National Automotive Sampling System Crashworthiness Data System, the more times a vehicle rolls, the more unusual the accident. Less than one-tenth of one percent of rollover accidents have a roll count of four.

Dr. Vogler criticized Whitfield's statistical analysis, noting that the FARS data he used captures only 4% of the rollovers that occur annually. Moreover, because fatal accidents often result from factors unrelated to vehicle design, the accuracy of the analysis is compromised. Furthermore, exclusion of vehicles with driver-side airbags eliminated 40% of passenger minivans, including models comparable to the Aerostar. In addition, Whitfield did not normalize the data to account for measure for risk exposure relative to other vans and ignored the numbers of each type of vehicle on the road.

Given the limitations of the FARS data, Dr. Vogler testified that she used the Combined State Database, which compiles accident reports for all accidents in a given state, and the R.L. Polk Registration Database, a compilation of vehicle registration data from all 50 states. Dr. Vogler took the data from the first database and from FARS, normalizing both using the data from the second database by the number of vehicles on the road and the length of time they were registered. Dr. Vogler found that the Aerostar's rollover rate was comparable to other small vans, which have a lower rollover rate than passenger cars and light trucks.

At the conclusion of the trial, the jury deliberated and returned a verdict in favor of Ford. The jury also answered a special interrogatory finding Partipilo's driving the sole proximate cause of the plaintiffs' injuries and death. Plaintiffs filed a posttrial motion. The trial court denied that motion and entered a judgment on the verdict. Plaintiffs now appeal.

I

The standard to be used in determining whether to grant a new trial is whether the jury's verdict was against the manifest weight of the evidence. Maple v. Gustafson, 151 Ill. 2d 445, 455 (1992). "'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.'" Maple, 151 Ill. 2d at 454, quoting Villa v. Crown Cork & Seal Co., 202 Ill. App. 3d 1082, 1089 (1990). This court will not reverse a trial court's ruling on a motion for a new trial except in those instances where it is affirmatively shown that the trial court clearly abused its discretion. Maple, 151 Ill. 2d at 455. An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. People v. Illgen, 145 Ill. 2d 353, 364 (1991). However, unlike motions for judgment n.o.v., a court may consider errors in the exclusion or admission of evidence and grant a new trial if there were serious and prejudicial errors made at trial. See Bartlett Bank & Trust Co. v. McJunkins, 147 Ill. App. 3d 52, 63 (1986).

II

Plaintiffs argue that the trial court erred in admitting opinion testimony of Deputy Robert Ewing and Sergeant Daniel Goris as to the cause of the rollover crash. Plaintiffs argue that their opinions were inadmissible as lay testimony because they did not witness the crash. Plaintiffs

argue that their opinions were inadmissible as expert testimony because they lacked the background and experience that would qualify them to testify as to the cause of a rollover crash, e.g., training in physics, mechanical engineering, automotive engineering, vehicle dynamics or kinematics, or accident reconstruction.

Ford initially responds that plaintiffs waived this issue by soliciting opinion testimony from Sgt. Goris. A review of the cited transcript, however, shows that the testimony at issue was not on the ultimate issue of causation. Accordingly, we turn to consider whether the testimony at issue is lay or expert testimony.

An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons and where such testimony will aid the trier of fact in reaching its conclusions. People v. Novak, 163 Ill. 2d 93, 104 (1994). An expert need only have knowledge and experience beyond that of the average citizen. Novak, 163 Ill. 2d at 104. There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research. Novak, 163 Ill. 2d at 104. Whether an individual is an expert on a particular subject is a matter generally reserved to the sound discretion of the trial court. Schaffner v. Chicago & North Western Transportation Co., 129 Ill. 2d 1, 36 (1989). As with the motion for new trial, an abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. Illgen, 145 Ill. 2d at 364.

The specific issue is whether these two police officers were qualified to give expert testimony on causation regarding the crash. An officer whose knowledge is based primarily on practical experience is no less an expert than one who possesses particular scientific or academic

9

knowledge. Ralston v. Plogger, 132 Ill. App. 3d 90, 98 (1985). Thus, case law shows that the issue turns on the experience of the testifying officer.

For example, in Wade v. City of Chicago Heights, 295 Ill. App. 3d 873 (1998), the defendant city challenged the ability of an engineer to rely on the opinion of the city's own police officer, Henry Rice, Jr., regarding the cause of an accident, arguing that Rice was not qualified to render that opinion. This court rejected the argument:

> "In cases cited by the City, where the officer was held to be
> unqualified to state an opinion about the cause of the accident, the
> officer was inexperienced. In Thurmond v. Monroe, [159 Ill. 2d
> 240, 249] (1994), the officer had been with the department for one
> year at the time of the accident and had investigated fewer than 20
> cases. Thurmond, 159 Ill. 2d at 249. In Stricklin v. Chapman, [197
> Ill. App. 3d 385 (1990)], the officer had worked for the department
> for four months when investigating the case and was asked to
> recreate the events of the accident beyond his own observations.
> Stricklin, 197 Ill. App. 3d at 389. In contrast, Officer Rice was a
> 23-year veteran of his department at the time of the accident and
> based his conclusions regarding the point of impact on physical
> evidence found at the scene." Wade, 295 Ill. App. 3d at 883-84.

The Wade court held that the trial court did not abuse its discretion in admitting the testimony.

Similarly, in Loseke v. Mables, 217 Ill. App. 3d 521 (1991), the trial court admitted opinion testimony from an Illinois State Police trooper with 17 years of law enforcement

experience and training in accident reconstruction, which included 40 hours of instruction at the Illinois Police Academy and a 40-hour course at Illinois Central College, but who was *not qualified as a full-blown accident reconstructionist*. This court held that the trial court did not abuse its discretion in admitting the testimony. Loseke, 217 Ill. App. 3d at 523-25 (1991).

In this case, the record shows that plaintiffs' motion in limine to bar the police opinion testimony was argued before the trial judge on several occasions. For example, on May 23, 2005, the parties argued the motion, but plaintiffs' counsel was unclear as to what sort of foundation might be laid as to the qualifications of each officer. The court passed the issue at that time, but made the following comment:

"THE COURT: *** I see in your motion the things that would discredit the officer's testimony. I'm not a reconstructionist. I don't know about physics. I don't know about rollovers. That doesn't tell me what he does know, and those are the tings the Court's going to look at to determine if somebody's qualified.

He may not know about rollovers. I don't know that precludes him from testifying to his observations.

He may be qualified in spite of this as an expert. He may be. I don't know. I want to hear what he says."

On May 24, 2005, the transcript shows that the trial judge heard argument and ascertained from plaintiffs' counsel that the plaintiffs' position was that the only people who can give opinions on the causation of a rollover accident are reconstructionists. At that time, the judge responded, without ruling, that it was his understanding that one did not have to be a reconstruction expert to

11

give causation testimony and that the general rules regarding the qualification of experts applied. The trial court gave plaintiffs' counsel more time to identify case law directly on point. On June 9, 2005, the trial court ruled that both Deputy Ewing and Sgt. Goris were qualified to give the testimony that the court understood they were going to give. That ruling was memorialized in a written order. Plaintiffs' counsel later lodged a continuing objection during the hearings in which the trial court ruled on specific objections to portions of the videotaped testimony to be shown to the jury.

In this case, the record shows that Deputy Ewing had worked in law enforcement since 1991. He studied accident investigation at the Indiana Law Enforcement Academy, with an additional 40-hour reserve deputy course in accident investigation and further training at the Indiana State Police School. This instruction included instruction in identifying and distinguishing skid and yaw marks. Deputy Ewing estimated that since 1991, he had investigated, on average, 75 crashes annually, including roughly 5 to 10 rollovers annually. Some of these accidents occurred on the interstate with ejected passengers.

Sgt. Goris started in law enforcement as a road deputy in 1976. Goris testified that he attended 80 hours of crash investigation school and 40 hours of advanced technical crash investigation. As a technical crash investigator, he had investigated numerous crashes, including interstate rollovers with ejected passengers.

Given these qualifications and the prevailing case law, it was not fanciful, arbitrary or unreasonable for the trial court to allow the police to give causation testimony, based on their years of experience and real-world expertise as accident investigators. Their lack of particular scientific or academic knowledge goes to the weight of their testimony, not its admissibility.

Nor can the police opinions be said to have been unfairly prejudicial to plaintiffs' case. The limits on the scope of their expertise were well established on cross-examination. Deputy Ewing's testimony identifies more than one contributing cause to the accident. Sgt. Goris explicitly admitted that he had no opinion as to whether the design of the Aerostar was a contributing cause of the rollover. Plaintiffs admit in their brief that the driver's maneuvers were a proximate cause of the rollover. Nor did plaintiffs limit themselves to accident reconstruction experts in this case, presenting expert testimony from statistician Randy Whitfield in their attempt to prove that the Aerostar's design was connected to an over-involvement in rollover accidents. Thus, it cannot be said that accident reconstruction, engineering, physics and the like are the only types of expertise relevant to determining the cause or causes of a rollover accident.

Accordingly, this court concludes that the trial court did not abuse its discretion in admitting the police opinion testimony.

### III

Plaintiffs next argue that the trial court erred in admitting expert testimony from Dr. Michelle Vogler, who testified at trial about: the risk of rollover for small vans generally; the risk of rollover for the Aerostar relative to the risk of rollover for passenger cars, light trucks and other small vans; and the statistical correlation between a vehicle's static stability and the risk of rollover. Dr. Vogler's opinions were based in part on data derived from accident reports in five states and data from the R.L. Polk Registration Database regarding vehicle registration in all 50 states. Plaintiffs argue that the trial court should have barred Dr. Vogler's testimony due to Ford's failure to produce the data forming the factual bases for those opinions.

Plaintiffs rely primarily on dicta from this court's opinion in Petre v. Kucich, 331 Ill. App. 3d 935 (2002), a medical malpractice case in which the trial court barred defendants from presenting any evidence to the jury relating to their expert's unpublished statistical compilations. This court stated that the trial court had not abused its discretion in barring the testimony, because defendants' failure to disclose the protocols and data underlying the study violated Supreme Court Rule 213 (177 Ill. 2d R. 213) and denied plaintiffs the opportunity both to have their own experts evaluate the study and to appropriately cross-examine the expert. Petre, 331 Ill. App. 3d at 947-48.

Supreme Court Rule 213 provides in relevant part as follows:

"(f) Identity and Testimony of Witnesses. Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:

* * *

(3) Controlled Expert Witnesses. A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the

witness; and (iv) any reports prepared by the witness about

the case." 210 Ill. 2d R. 213 (f)(3).

Thus, the plain language of the rule requires that a party provide certain types of information upon written interrogatory. The rule specifies that with respect to a controlled expert witness, the party must identify the bases for the expert's conclusions and opinions.

On this issue, Ford identified the bases for Dr. Vogler's opinions and conclusions, identifying the specific databases she employed for her statistical analysis. This renders <u>Petre</u> distinguishable, not only because the expert there could not identify the data, but also because the expert there was the exclusive source for obtaining the underlying data. In addition, there was no suggestion in <u>Petre</u> that the expert would agree to provide the underlying data subject to a protective order.

Plaintiffs argue, as they did in the trial court, that Rule 213 requires not only that Dr. Vogler disclose the bases for her opinions, but that she produce and provide a copy of the actual data to them. Rule 213(f), by itself, does not require production of evidence. Rule 213(e) provides that a <u>party</u> served by interrogatory <u>may</u> answer by producing documents within that party's possession and control, but that the production of documents shall comply with the requirements of Rule 214. In turn, Rule 214 sets forth the procedure for written requests, with objections being heard by the court upon prompt notice and motion of the requesting party.

In this case, plaintiffs sought data not from Ford, but from one of Ford's controlled party experts. Plaintiffs cite no authority for this situation, aside from the <u>dicta</u> in <u>Petre</u>, which is distinguishable as noted above. In this case, Dr. Vogler provided some data, but stated her

objection to providing the specific data at issue here without a protective order, because her firm obtained the data pursuant to agreements that precluded the firm from freely distributing the data.

Plaintiffs do not provide any citation to the record showing that they promptly notified and moved the trial court to hold a hearing on the objection. Ford provided Dr. Vogler's report to plaintiffs in December 2004. Plaintiffs apparently did not request the additional data at issue until March 2005. Plaintiffs were notified by Ford's counsel that the data at issue here would not be produced absent a protective order in June 2005. Plaintiffs point to nothing in the record showing that they promptly moved to resolve the dispute. Rather, plaintiffs sought to have the trial court bar Dr. Vogler's testimony in October 2005, days before she was due to testify.

Given the facts and circumstances of the case, the trial court did not abuse its discretion in refusing to bar Dr. Vogler's testimony at that time.

IV

Plaintiffs next contend that the trial court erred in denying plaintiffs' motion to deem facts admitted, specifically to admit that Dr. Chase used the correct ADAMS database in conducting his simulations of the Aerostar's performance of J-turns and of the rollover.

Rule 216 provides that a party to an action may serve another party to that action with a written request for his admission of "any specified relevant fact" set forth in the request. 134 Ill. 2d R. 216(a); P.R.S. International, Inc. v. Shred Pax Corp., 184 Ill. 2d 224, 234 (1998). The party receiving the request must then either deny or object to the request within 28 days, but if that party does neither, the factual matters in the request are deemed judicial admissions. See 134 Ill. 2d R. 216(c); see also Banco Popular v. Beneficial Systems, Inc., 335 Ill. App. 3d 196, 208 (2002). Issues of which requests were proper under the rule and which requests should be

deemed admissions are questions of law to be reviewed de novo. P.R.S. International, Inc., 184 Ill. 2d at 233-34.

Rule 216(c) provides as follows:

"Each of the matters of fact and the genuineness of each document of which admission is requested is admitted unless, within 28 days after service thereof, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part. If written objections to a part of the request are made, the remainder of the request shall be answered within the period designated in the request. A denial shall fairly meet the substance of the requested admission. If good faith requires that a party deny only a part, or requires qualification, of a matter of which an admission is requested, he shall specify so much of it as is true and deny only the remainder. Any objection to a request or to an answer shall be heard by the court upon prompt notice and motion of the party making the request." 134 Ill. 2d R. 216(c).

Plaintiffs first argue that Ford's response was not a sworn statement. However, "the plain language of the rule states that the party to whom the requests to admit are directed must serve upon the requesting party either 'a sworn statement' denying the matters of which admission is requested or written objections which need not be sworn." Vision Point of Sale, Inc. v. Haas, 226 Ill. 2d 334, 355 (2007). In this case, Ford's response to one of plaintiffs' interrogatories regarding the ADAMS data was not a denial, but an objection. Thus, it was not required to be sworn. However, both responses also state that Ford is unable to admit or deny, which may fall within the part of the rule requiring a sworn statement.

Plaintiffs rely primarily on Moy v. Ng, 341 Ill. App. 3d 984 (2003), a case overruled by our supreme court in Vision Point of Sale, 226 Ill. 2d at 355-56, which held that a verification of the response by a corporate officer was sufficient to meet the requirements of Rule 216(c). In this case, the responses were accompanied by a sworn certification by an agent of Ford authorized to do so, based on facts assembled by authorized employees and counsel of Ford.

Plaintiffs also argue that Ford did not provide a reason for its inability to admit or deny the interrogatories regarding the ADAMS data. However, a reading of the responses to the interrogatories, not to mention the further explanations provided to the trial court at the hearing on plaintiffs' motion to compel an answer, shows that Ford provided detailed technical reasons why it was unable to admit or deny whether plaintiffs' ADAMS data was the proper data.

Accordingly, the trial court probably did not err in in denying plaintiffs' motion to deem facts admitted.

V

Plaintiffs finally contend that the cumulative effect of the trial court's errors deprived them of a new trial. However, inasmuch as the asserted errors were not an abuse of discretion or an error of law in the case of the request to admit, the cumulative effect cannot rise to the level of reversible error.

For all of the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

NEVILLE, P.J., and O'BRIEN, J., concur.