FOURTH DIVISION
July 22, 2010

1-08-1072

| | | |
|---|---|---|
| MARIA COLELLA, as Special Administrator of the Estate of Francesco Colella, Deceased, | )  ))  )) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | )) )) | |
| v. | ) ) | No. 04 L 401 |
| JMS TRUCKING COMPANY OF ILLINOIS, INC., an Illinois Corporation, and SAMUEL J. INENDINO, Individually, | ) ) ) ) | Honorable Susan Ruscitti Grussel, Judge Presiding. |
| Defendants-Appellants and Third-Party Plaintiffs-Appellants | ) ) | |

(Benchmark Construction Company, Inc.,

Third-Party Defendant-Appellee).

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff-appellee, Maria Colella, as special administrator of the estate of Francesco Colella, deceased, brought the instant lawsuit to recover damages after her husband Francesco was struck and killed by a dump truck in a construction accident. Maria Colella brought this suit against the owner of the truck and its driver, defendants-appellants JMS Trucking Company of Illinois, Inc., an Illinois corporation (JMS), and Samuel J. Inendino, individually. In turn, JMS filed a third-party complaint for contribution against Francesco's employer, Benchmark Construction Company, Inc. (Benchmark).

Following a jury trial, a multimillion dollar judgment was entered in favor of the plaintiff and against JMS and Inendino. The jury returned an itemized verdict in the amount of $9,264,000. That amount was reduced to $8,338,140 based on the finding by the jury that the

percentage of negligence attributable to Francesco Colella was 10%. The jury found the percentage of negligence attributable to defendants was 90%. The jury found against defendants on their contribution claims. The jury found the percentage of negligence attributable to Benchmark was 0%. A subsequent posttrial motion attacking the judgments filed by JMS and Inendino was denied, and they now appeal. For the reasons that follow, we affirm.

BACKGROUND

Maria Colella, acting as special administrator of the estate of her deceased husband Francesco, filed the instant lawsuit on January 13, 2004. The complaint generally alleged that on January 4, 2004, Francesco was employed by Benchmark and was working on a construction site in Chicago. While working on that site, Francesco was killed in an accident involving a dump truck owed by JMS and driven by its employee Inendino. Seeking to recover for the injuries and expenses incurred by Francesco and his family as a result of the fatal accident, the three-count negligence complaint was brought pursuant to the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2004)), the Rights of Married Persons Act (750 ILCS 65/15 (West 2004)), and the Survival Act (755 ILCS 5/27-6 (West 2004)). JMS and Inendino subsequently filed a third-party contribution claim against Benchmark, asserting that it was Benchmark's negligence that led to Francesco's death.

Prior to trial, the lower court addressed a number of motions *in limine*. Among them was a defense motion to bar the testimony of the plaintiff's expert, James Brennan. The trial court denied that motion, finding that Brennan's proffered experience qualified him as an expert. However, the trial court granted Benchmark's motion *in limine* to limit the scope of the

appellants' questioning of its employees. Specifically, Benchmark was concerned that JMS and Inendino would attempt to question its employees about their duties on the jobsite and their breach of those duties. The trial court found that the plaintiffs could not discuss any such opinions, because they were never properly disclosed. However, the trial court indicated that the appellants were free to question the employees about their duties, their activities, and their observations.

The matter proceeded to a jury trial in April and May of 2007. At trial, several of Francesco's coworkers testified about the accident. Specifically, the jury heard testimony from Benchmark employees John Braglia, Michael D'Andrea, John Fiordirosa, and Joseph Etter, as well as Benchmark supervisor Wayne Crew. Each coworker generally testified that Benchmark was involved in the installation of a new water main along 79th Street on the southwest side of Chicago. On the day of the accident, the Benchmark crew were removing some backfill from a ditch that surrounded the new water main. They were preparing the area for new concrete to be poured to complete the project. JMS, and its driver Inendino, were also involved in the project that day. They provided a dump truck to receive the backfill and remove that material from the construction site.

In order to complete this process, the Benchmark employees also had to elevate existing manhole covers to the proper height to ensure that they would be at grade when the new concrete was poured to cover the ditch. To accomplish this task, the crew would run a string line from one side of the ditch to the other. In that manner, they could measure the level of the existing manhole in reference to the level of the existing pavement and make any necessary adjustments.

Colella was involved in this measurement process when the accident occurred.

Braglia testified that he and Colella held the string line taut while Fiordirosa took the measurement at the manhole cover. Colella was holding the string on the east side of the ditch, in a narrow area between the ditch and the rear of the JMS dump truck. Just after he and Colella had finished the measurement, and just as Braglia got up to retrieve the materials needed to elevate the manhole cover to the proper height, Braglia heard Colella yell and turned to see him tangled in the JMS truck's rear tires as it pulled away. Braglia testified that he never saw Inendino walk around the dump truck before driving off. Braglia believed that if that had occurred, he would have noticed because Inendino would have been required to step over the string line to do so.

Fiordirosa confirmed that the accident occurred directly after he, Colella, and Braglia finished taking the measurement. He testified that Colella stood under the JMS truck to take the measurement and that he believed the truck was running at the time. Fiordirosa was not too concerned about Colella's location because the JMS truck cab was empty at the time. Fiordirosa also testified that the accident occurred immediately after taking the measurement, and he indicated that he did not hear any warning before the JMS truck pulled out. He did hear the truck being put into gear as it pulled out, and when he turned to look, he saw Colella being run over and dragged by the rear wheels of the truck. Fiordirosa never observed Inendino walk around the truck prior to pulling away.

D'Andrea testified that he was operating a backhoe, excavating the ditch, and placing the material in the JMS truck. He stated that shortly before the accident, Inendino indicated that he

4

had been told to leave. D'Andrea assumed Inendino meant that Benchmark foreman Wayne Crew told Inendino to do so. Shortly thereafter, he heard screams and saw the JMS truck run over Colella, near where he had previously observed Colella with the string line.

Etter provided similar testimony to the other Benchmark employees, although he was located on the far south side of the ditch and only peripherally observed the other workers before the accident. He did observe Colella being run over by the rear tires of the JMS truck after he heard screaming and turned to look.

Benchmark's foreman, Wayne Crew, testified that when he arrived on the site on the morning of the accident, his crew was already working. It appeared that Braglia, Fiordirosa, and Colella were preparing to take a string line measurement. At the time, Colella was inside the ditch but Crew never saw his exact position at the time of the accident as his view was blocked. Crew testified that he spoke with Inendino and told him that if he had a full load he could leave. He then observed Inendino and D'Andrea have a brief exchange. He never saw Inendino walk around his truck before pulling away. Shortly thereafter he heard screams and observed Colella being run over.

Crew did admit that as foreman, he had a responsibility for the safety of the Benchmark crew. He also stated that it was wrong for a worker to position himself in front of the rear tires of a dump truck to complete the string line measurement. The appellants also read a portion of Crew's deposition testimony which he stated it was his responsibility to ensure that all was clear before a dump truck pulled out of a construction site. At trial, Crew stated that he was referring to an open site with nearby traffic and not a closed site such as the one at issue in this case.

Defendant Inendino also testified at trial, indicating that the accident occurred as he was leaving with his second load of the day. He stated that his truck was parked very near the ditch, and that he observed the Benchmark crew complete the string line measurement while his truck was being loaded by the backhoe operated by D'Andrea. However, by the time his truck was full and he was ready to leave, that measurement had long been completed and there were no Benchmark employees in or around the ditch. Inendino testified that Crew told him to leave, he informed D'Andrea to stop filling the truck, and he then did a safety walk around the truck prior to leaving. He then got in the cab, checked his rearview mirrors, and pulled away. He did not hear anything as he left the site and only found out about the accident later.

Inendino admitted that in prior statements he had either indicated he did not complete a walk around his truck or had failed to state that he had done so. He also acknowledged that it was his duty to complete such a walk around on a construction site, but maintained at trial that he did so.

The jury heard testimony from Chicago police officer James Mullins. Mullins was assigned to investigate the accident as part of the major accident investigation unit. As part of his investigation he compiled a written report after he interviewed the members of the Benchmark crew and Inendino. At trial, and over a defense objection, Mullins was allowed to read from his report and testify regarding those interviews. In general, that testimony coincided with the testimony those witnesses themselves gave at trial. Notably, however, Mullins testified that Crew told him that he had indicated that Inendino could leave and Inendino told Mullins that he did not walk around the truck prior to leaving.

Colella's trucking expert, James Brennan, also testified over defendant's objection. Brennan stated that he had 38 years of professional experience driving trucks in construction settings, 13 of which were spent driving a dump truck similar to the JMS truck involved in this accident. Brennan had held a commercial driver's license (CDL) during that time, but he did not hold one at the time of trial. Brennan testified that, based upon his knowledge and experience, a dump truck driver is required to walk around his vehicle before leaving a construction site to check for any safety issues. A driver should check his mirrors in the cab before pulling away, and if those mirrors were properly adjusted, the area in front of the rear wheels would be visible.

The Benchmark employees also testified about the events just after the accident. In general, they each testified that the JMS truck appeared to have run over and dragged Colella with its rear tires. Colella had extensive injuries to his leg, arm, and mid-section. Braglia testified that he reached Colella almost immediately after the accident and that Colella was groaning. Colella was trying to say something and his eyes remained open for three to four minutes. An ambulance arrived within 10 minutes of the accident.

Dr. Kendall Crowns, the Cook County medical examiner's office physician who conducted a postmortem examination of Colella on the day after the accident, concluded that Colella had died as a result of multiple injuries suffered after being struck by the JMS dump truck. Those injuries included two severed fingers and a partially severed thumb. Colella had multiple abrasions to his face, arms, and legs, as well as lacerations to his left leg. A large laceration cut across his abdomen, exposing internal organs. There were additional injuries to Colella's lower torso, including significant damage to his intestines, prostate, and scrotum.

However, Dr. Crowns found no internal damage to the upper body and opined that Colella's heart and brain likely continued to function after the accident. He further opined that Colella could have remained conscious until he ultimately bled to death, which would have taken approximately three minutes. Colella would not have been able to move or talk if he were not conscious.

Finally, the jury was presented with evidence regarding the loss suffered by Colella's family. Maria Colella, Colella's wife, testified that the two had been married for 37 years and had three adult children. Their two sons lived at home, and their daughter lived less than a mile away. The two were born and were married in Italy, before they moved to this country in 1974. Maria testified through an interpreter, as her English was poor and she had previously relied on Colella to assist her in that regard.

Two of Colella's children, Loretta Verna and John Colella, also testified. They each described their father as a loving, generous, and engaged person. They also testified that he had a very close relationship with his wife and his third child, Michael. Michael was mentally disabled and was very dependent on his parents, especially his father. Michael seems to have regressed since his father died, and Maria is no longer as social as she used to be.

Following the presentation of evidence and closing arguments, the jury returned a verdict in favor of the plaintiff and against JMS and Inendino. A verdict was also entered against JMS and Inendino on their contribution claim against Benchmark. The jury awarded the following amounts as damages: $20,600 for medical expenses, $244,000 for lost future earnings, $1 million for Colella's pain and suffering, and $8 million for the loss of society suffered by Colella's

family. This $9,264,600 overall judgment was then reduced to $8,338,140, based upon the jury's conclusion that the percentage of negligence attributable to JMS and Inendino, Colella, and Benchmark was 90%, 10%, and 0%, respectively. The jury also answered two special interrogatories, finding that Benchmark's conduct was not a proximate cause of the accident and Collella's own negligence was not more than 50% of the proximate cause of the accident.

Thereafter, JMS and Inendino filed a posttrial motion requesting either a new trial, a remittitur, and/or judgment notwithstanding the verdict on their counterclaim against Benchmark. The trial court denied that motion, and JMS and Inendino now appeal.

ANALYSIS

On appeal, JMS and Inendino assert that various errors in the admission of evidence, limitations on their questioning of Benchmark's employees, and instructions given to the jury entitle them to a new trial on the issue of their liability to Colella. They also contend that the damages awarded by the jury were so excessive that they are entitled to either a remittitur or a new trial on damages. Finally, JMS and Inendino claim that the jury's verdict on their counterclaim against Benchmark was not supported by the evidence and request that we grant judgment notwithstanding the verdict. We address these issues in turn, ultimately finding each of the appellants' assertions of error either waived, harmless, or unpersuasive.

I. Motion for New Trial – Trial Court Errors

We first address the assertion by JMS and Inendino that various errors made by the trial court entitle them to a new trial on liability.

In considering whether a motion for a new trial should be granted, the trial court should

set aside a jury's verdict only if it was contrary to the manifest weight of the evidence or a party has been denied a fair trial. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). The trial court is in a superior position to consider any errors that occurred, the fairness of the trial to all parties, and whether substantial justice was accomplished. *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 932-33 (1994). A trial court's ruling on a motion for new trial will not be reversed unless there is an affirmative showing that it clearly abused its discretion. *Gustafson*, 151 Ill. 2d at 455.

## A. Evidentiary Issues

Our first consideration is the appellants' assertion that the trial court made a number of evidentiary errors.

The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 33-34 (2003). An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 912 (2007).

## 1. Richard Brennan's Expert Testimony

JMS and Inendino first contend that Brennan should not have been allowed to testify as an expert because either he was not qualified to do so or his opinions were not a proper subject of expert testimony. They also assert that the trial court improperly ruled upon certain documents discussed during Brennan's testimony. We disagree.

Expert testimony is not limited to scientific or technical areas, but rather all areas of specialized knowledge. *Meyers v. Woods*, 374 Ill. App. 3d 440, 451 (2007). Indeed, "[t]here is

no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research." *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 816 (2008). A witness will be allowed to testify as an expert if his experience and qualifications provide him with knowledge that is not common to the layperson and where such testimony will aid the trier of fact. *Favia*, 381 Ill. App. 3d at 816. Whether a witness is allowed to testify as an expert is within the sound discretion of the trial court. *Meyers*, 374 Ill. App. 3d at 451.

Here, Brennan testified that he had held a specialized CDL and had a total of 38 years of professional experience driving large trucks in construction settings. Over 13 years of that time was spent driving a dump truck similar to the one involved in this case. Moreover, the subject of his testimony was the various responsibilities of a driver of such specialized equipment in the specific context of a construction site. We see no reason why this extensive practical experience was insufficient to qualify Brennan as an expert in this area, nor do we find that the trial court abused its discretion in finding the subject of Brennan's testimony to be outside the knowledge of the common juror.

With respect to the documents used during Brennan's testimony, the appellants initially object to Brennan's testimony regarding the JMS safety manual for its drivers. Brennan identified this document and quoted from various specific portions therein. However, Brennan also specifically testified that he relied on the JMS manual to form his opinions at trial. Our supreme court has recognized that an expert may be allowed to testify regarding the basis for his opinion, as an expert's opinion is only as valid as the reasons that underlie it. *Schultz v.*

11

*Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 298-99 (2002). Furthermore, the admissibility of facts underlying an expert's opinion is within the sound discretion of the trial court. *Bass v. Cincinnati Inc.*, 281 Ill. App. 3d 1019, 1023-24 (1996). We find that the trial court did not abuse its discretion by allowing Brennan to testify regarding the JMS safety manual. Our decision on this matter is further supported by the fact that Inendino himself also testified regarding the safety manual, its contents, and his agreement with its provisions.

The appellants also object to testimony regarding the existence of a 157-page Illinois CDL study guide and the trial court's admission of that guide into evidence. Without respect to whether the trial court's decision was correct or not, the guide was only mentioned briefly and was never shown or provided to the jury. The appellants have not identified any prejudicial effect this brief mention of the mere existence of such a study guide had in this case, and we do not see any. We are mindful that a party is not entitled to a reversal based upon evidentiary rulings unless the error was substantially prejudicial and affected the outcome of the trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002).

### 2. Officer Mullins' Testimony and Report

We next consider the appellants' contention that the trial court improperly allowed certain testimony from Officer Mullins and incorrectly admitted his report into evidence as a business record. While we agree that the trial court committed error, we find that appellants cannot demonstrate reversible error.

Here, the trial court determined that Officer Mullins' report was admissible as a business

record pursuant to Supreme Court Rule 236(a) (145 Ill. 2d R. 236(a)).  This decision was incorrect, as Rule 236(b) clearly states "[a]lthough police accident reports may otherwise be admissible in evidence under the law, subsection (a) of this rule does not allow such writings to be admitted as a record or memorandum made in the regular course of business." 145 Ill. 2d R. 236(b).  Accordingly, Mullins' report was incorrectly admitted into evidence as a business record.          However, we fail to see how the appellants were prejudiced by this admission.  The statements the Benchmark employees made to Mullins and which were contained in his report were used by both parties in questioning Officer Mullins at trial.  Indeed, it was the appellants who first made reference to the those statements and the police report in the prior questioning of Braglia.  "It is established that a party may introduce evidence, ordinarily improper, where the opponent has opened up the issue and the party seeking to introduce the evidence would be prejudiced unless allowed to introduce it." *Conner v. Ofreneo*, 257 Ill. App. 3d 427, 434 (1993).  While is it clear that the trial court improperly admitted the report into evidence, the record is also clear that Mullins' report was never provided to the jury and did not go into the jury room during jury deliberations.  For the reasons previously discussed, the appellants cannot establish the substantial prejudice required for a reversal.  *Simmons*, 198 Ill. 2d at 566-67.

Finally, we also note that JMS and Inendino specifically complain they were prejudiced by Mullins' testimony regarding the "opinions and conclusions" contained in his report.  However, our review of the record establishes that in all but a single instance, the plaintiff's attempts to introduce such opinions and conclusions were unsuccessful.  The trial court either

13

sustained the defendants' objection or the question was withdrawn. The single exception occurred when Mullins was permitted to testify regarding his conclusion that the metal undercarriage of the dump truck did not appear to have struck Colella. The appellants have not identified how this testimony was prejudicial and we are unable to discern any prejudice as this issue does not appear to have been relevant or controverted at trial.

In sum, we find no reversible error in the trial court's handling of Mullins' report and testimony.

### 3. Questioning of Benchmark's Employees

The next issue raised by the appellants is the trial court's limitation of their questioning of Benchmark's employees at trial. They contend that it was error for the trial court to grant Benchmark's motion *in limine* barring them from questioning Benchmark employees regarding their opinions on the basis that those opinions were not properly disclosed. We conclude that this argument by appellants is essentially waived and ultimately fails to support their motion for a new trial. A trial court maintains broad discretion in both the admission of evidence and in ruling upon a motion *in limine*, and a decision on a motion *in limine* will not be disturbed absent an abuse of that discretion. *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 801-02 (2009).

As an initial matter, the appellants have waived any review of the motion *in limine* with respect to the testimony of those Benchmark employees other than Wayne Crew. "When a motion *in limine* is granted, the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). An

offer of proof informs the trial court, opposing counsel, and the reviewing court of the nature and substance of the evidence sought to be introduced. *K4 Enterprises, Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 318 (2009). A proper offer of proof is the key to preserving a trial court's alleged error in excluding evidence. *K4 Enterprises,* 394 Ill. App. 3d at 318. The appellants have not, in the trial court or on appeal, identified exactly what testimony from these employees they were precluded from presenting. They have also failed to make a proper offer of proof or identify how they were prejudiced by the trial court's limitation. We, therefore, have no way of determining any possible prejudice and must find this argument waived with respect to any such testimony.

The situation is somewhat different regarding the testimony of Crew. The record reflects that the appellants identified specific evidence and opinions they sought to elicit from Crew. This evidence and these opinions were either contained in portions of Crew's discovery deposition or were sought by the appellants in their cross-examination of Crew. The trial court initially granted Benchmark's motion *in limine* on the basis that such opinions were not properly disclosed pursuant to Supreme Court Rule 213(f) (210 Ill. 2d R. 213(f)). However, Supreme Court Rule 213(g) provides:

> "The information disclosed in answer to a Rule 213(f)
> interrogatory, or in a discovery deposition, limits the testimony that
> can be given by a witness on direct examination at trial.
> Information disclosed in a discovery deposition need not be later
> specifically identified in a Rule 213(f) answer, but, upon objection
> at trial, the burden is on the proponent of the witness to prove the

15

information was provided in a Rule 213(f) answer or in the discovery deposition. Except upon a showing of good cause, information in an evidence deposition not previously disclosed in a Rule 213(f) interrogatory answer or in a discovery deposition shall not be admissible upon objection at trial.

Without making disclosure under this rule, however, a cross-examining party can elicit information, including opinions, from the witness." Official Reports Advance Sheet No. 26 (December 20, 2006), R. 213(g), eff. January 1, 2007.

By granting Benchmark's motion *in limine* and sustaining Benchmark's objections during portions of the trial, the trial court would appear to have failed to comply with the provisions of Supreme Court Rule 213(g). Specifically, Rule 213(g) allowed the appellants to introduce opinions that were either contained in Crew's discovery deposition, identified in a Rule 213(f) answer, or elicited on cross-examination without the need for a specific Rule 213(f) disclosure before trial.

We note, however, that a ruling on a motion *in limine* is interlocutory and subject to reconsideration. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 334 (2000). Despite the trial court's initial ruling, the record establishes that the appellants were able to elicit Crew's opinions on cross-examination that: (1) it was his duty to supervise the Benchmark employees and ensure they worked in a safe manner, and (2) it would be wrong for a worker to position himself in front the JMS rear wheels to complete the string line measurement. The appellants

were also able to read into the record Crew's deposition testimony, which indicated that it was part of his responsibility to ensure that the area around a dump truck was clear before the truck left the site. The parties were then allowed to further question Crew about that statement at trial. Finally, the appellants were able to utilize this evidence to argue to the jury that Crew, third-party defendant's foreman, was "not doing his job."

Thus, the record reflects that the testimony and opinions specifically identified by the appellants were ultimately admitted into evidence and considered by the jury. The appellants further contend that there was other deposition testimony they wanted to address and other questions they would have liked to have asked Crew on cross-examination; however, they failed to support any such assertions of error with a proper offer of proof in the trial court. For the reasons previously discussed, we conclude that the trial court did not abuse its discretion in denying the appellants a new trial on this basis.

## B. Jury Instructions

We next address the appellants' contention that the trial court erred in instructing the jury. Specifically, they assert that the trial court improperly gave duplicative instructions on Inendino's alleged violations of the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq*. (West 2004)) and the common law. They also argue that the trial court's instruction on the ability to recover for pain and suffering was improper.

It is within the discretion of the trial court as to which instructions to give to the jury, and the court's decision will not be disturbed absent an abuse of that discretion. *Schultz*, 201 Ill. 2d at 273. Whether a trial court abused its discretion depends on whether, taken as a whole, the

17

instructions fairly, fully, and comprehensively inform the jury of the relevant legal principles. *Schultz*, 201 Ill. 2d at 273-74.

The appellants initially take issue with plaintiff's jury instructions Nos. 28, 29, 30, as well as the issues instruction No. 11. Instruction Nos. 28, 29, 30 were modeled after Illinois Pattern Jury Instructions, Civil, No. 60.01 (2006) (hereinafter IPI Civil (2006)). Each instruction set forth a separate section of the Illinois Vehicle Code, stated that the code section was in force at the time of the accident, and provided that should the jury decide that a party violated that section, the jury may consider that fact together with all other facts and circumstances in evidence on the question of defendants' negligence. Instruction No. 11, modeled after IPI Civil (2006), No. 600.04, contained an issues instruction on negligence for cases involving a third-party contribution claim. That instruction also included the plaintiff's allegations of the defendants' common law negligence.

The appellants assert that these separate instructions essentially contain the same legal principles and that providing all of these instructions to the jury was duplicative and confusing. However, while the appellants raised other, unrelated objections to some of these instructions below, they did not raise this specific objection. A party waives the right to object to jury instructions when the party fails to make a specific objection during the jury instruction conference. *Ozik v. Gramins*, 345 Ill. App. 3d 502, 520 (2003). Timely objection assists the trial court in correcting any problem and prohibits the challenging party from gaining an advantage by obtaining reversal based on the party's own failure to act. *Ozik*, 345 Ill. App. 3d at 520, citing *Morus v. Kapusta*, 339 Ill. App. 3d 483, 489 (2003). Furthermore, the doctrine of invited error

prohibits a party from complaining of an error on appeal " 'which that party induced the court to make or to which that party consented.' " *Oldenstedt v. Marshall Erdman & Associates, Inc.*, 381 Ill. App. 3d 1, 14 (2008), quoting *In re Detention of Swope*, 213 Ill.2d 210, 217 (2004).

Because the plaintiffs did not object on this basis at trial, we find this argument waived. Moreover, even if not waived, this contention would not be availing to JMS and Inendino, as mere repetition of an instruction does not alone constitute reversible error. *Grossman v. Gebarowski*, 315 Ill. App. 3d 213, 224 (2000).

The appellants also contend that plaintiff's instruction No. 16, regarding the damages available in the plaintiff's survival action, was improper. This instruction, modeled on IPI Civil (2006), Nos. 31.10, 30.05, and 30.06, in part informed the jury that the plaintiff could recover for "[t]he pain and suffering experienced as a result of the injuries" to Colella before his death. JMS and Inendino assert that the trial court erred in not providing an alternative instruction limiting recovery to "conscious pain and suffering" in light of *Murphy v. Martin Oil Co.*, 56 Ill. 2d 423, 431-32 (1974), which held that "conscious" pain and suffering was recoverable in a Survival Act claim.

We disagree with this contention. The trial court is required to use a pattern instruction when it is applicable and when it accurately states the law, and the court does not abuse its discretion by refusing to give a nonpattern instruction if an appropriate pattern instruction exists. *Schultz*, 201 Ill. 2d at 285. In this case, the pattern instruction states that recovery is available for "pain and suffering experienced," not "conscious pain and suffering." Moreover, we fail to see any real prejudice in the different language. As instructed, the jury could only award damages

for pain and suffering "experienced." We do not see how this instruction misled the jury or resulted in prejudice to the appellants. See, *Schultz*, 201 Ill. 2d at 273-74 (a trial court will be reversed based on giving an improper instruction only if it clearly misled the jury and resulted in prejudice to the appellant).

## II. Motion for Remittitur or New Trial - Jury Awards

The appellants next argue that the jury's award of $1 million for Colella's pain and suffering and $8 million for his family's loss of society was excessive. They ask for a remittitur or, alternatively, a new trial on damages.

The standards applicable to a jury award challenge have been previously summarized by this court:

> "The amount of a verdict is generally at the discretion of
> the jury. [Citation.] A damage award is not subject to scientific
> computation. [Citation.] A question of damages is to be
> determined by the trier of fact, and 'a reviewing court will not
> lightly substitute its opinion for the judgment rendered in the trial
> court.' [Citations.] However, a court will order a remittitur, or, if
> the plaintiff does not consent, a new trial, if a verdict is excessive.
> [Citation.] *** [T]he supreme court [has] indicated that an award
> may be viewed as excessive if it (1) exceeds the range of fair and
> reasonable compensation, (2) is the result of passion or prejudice,
> or (3) is so large that it shocks the judicial conscience. [Citation.]

> But remittitur will not be ordered when an award ' "falls within the
> flexible range of conclusions which can reasonably be supported
> by the facts." ' [Citations.]" *Velarde v. Illinois Central R.R. Co.*,
> 354 Ill. App. 3d 523, 540 (2004).

In support of their position that the $1 million award for Colella's conscious pain and suffering was excessive, the appellants point to the evidence that he was conscious for at most three to four minutes after the accident. They also cite to three cases in which either lower awards were made for longer periods of pain and suffering, or a similar amount was awarded for a longer period. *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 104 (1991) ($150,000 awarded on evidence of 30 minutes of conscious pain and suffering before death); *Balzekas v. Looking Elk*, 254 Ill. App. 3d 529, 537-38 (1993) ($600,000 awarded on evidence of 10 hours of conscious pain and suffering before death); *Pantaleo v. Our Lady of the Resurrection Medical Center*, 297 Ill. App. 3d 266, 278-79 (1998) ($1 million awarded on evidence of 26 hours of conscious pain and suffering before death).

We are not persuaded by these arguments. As an initial matter, the appellants do nothing to compare this case to the three cited cases other than identifying the total amount of the award and the time period of conscious pain and suffering involved. Even if they had done so, our courts have "traditionally declined to make such comparisons in determining whether a particular award is excessive." *Richardson v. Chapman*, 175 Ill. 2d 98, 114 (1997). Nor did the appellants provide any discussion of the truly horrific injuries Colella suffered or the types of pain and suffering he experienced before he lost consciousness and died. We note that the plaintiff

requested a $3 million award for Colella's pain and suffering and the jury awarded one-third of that amount. Based on the totality of the circumstances, the record does not reflect that this award exceeded the range of fair and reasonable compensation or was the result of passion or prejudice or that it shocks the judicial conscience such that we should substitute our judgment for that of the jury.

JMS and Inendino have supported their challenge to the $8 million award by the jury for loss of society only by noting that the amount of the award was high, Colella was 61 years old at the time of his death and it appeared to bear no relationship to the family's financial loss. They do not address the evidence that, even at the age of 61, the evidence established that Colella had a life expectancy of 21.5 years. They do not address the evidence of Colella's active family and social life, his wife's reliance on his English skills, or his disabled son Michael's reliance upon him and his regression since his death.

Moreover, while as noted above, comparisons to other cases are not typically useful in these discussions, we do note that one of the cases cited by the appellants did affirm an award of $8.3 million in damages for loss of society suffered by the victim's wife and two children. *Drews*, 144 Ill. 2d at 97. In light of all the evidence, we find that the jury's award for loss of society, which was less than the $14 million award plaintiff requested, was not excessive so as to require either a remittitur or a new trial on damages.

### III. Motion for Judgment Notwithstanding the Verdict – Contribution Claim

Finally, we consider the appellants' motion for judgment notwithstanding the verdict (judgment *n.o.v.*) on their contribution claim. They argue that the jury's verdict on their third-

party claim against Benchmark was not supported by the evidence.

Judgment *n.o.v.* should be granted only when all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant such that no contrary verdict based on that evidence could ever stand. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Gustafson*, 151 Ill. 2d at 454. The denial of a motion for judgment *n.o.v.* is reviewed *de novo*. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 88-89 (2002).

The appellants' argument rests on the testimony of Benchmark foreman Wayne Crew. They note that Crew acknowledged that part of his responsibilities as foreman included making sure that his crew performed their work in a safe manner. He also acknowledged that, at the time of the accident, he was positioned in such a way that he could not observe his crew working in the ditch. From this testimony, the appellants assert that the jury's attribution of 0% of the negligence proximately causing Colella's accident to Benchmark cannot stand. We disagree.

To establish Benchmark's alleged negligence and succeed on their counterclaim, JMS and Inendino were required to allege and prove that Benchmark owed a duty to Colella, that Benchmark breached that duty, and that the breach was the proximate cause of Colella's injuries. *Thompson v. County of Cook*, 154 Ill. 2d 374, 382 (1993). Proximate cause ordinarily is a question for the trier of fact, and judgment *n.o.v.* cannot be granted on this issue unless, as we

23

have noted above, " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967).

In the instant case, the jury heard testimony regarding Crew's duties regarding safety on the jobsite and the events leading up to the accident. However, the jury was also presented with testimony from Brennan, and Inendino himself, that Inendino had specific duties to walk around his truck and to adjust and check his mirrors before pulling away. The jurors also heard testimony suggesting that Inendino failed to complete some or all of these specific tasks just before the accident took place. Clearly, in this case the issue of proximate cause was the subject of conflicting evidence and factual dispute. *Gustafson*, 151 Ill. 2d at 454. The determination of that issue was therefore a question for the jury. Based on our review of the record, we cannot say that the evidence so overwhelmingly favored the appellants that the jury's verdict cannot stand, and we therefore reject the request to enter a judgment *n.o.v. Maple*, 151 Ill. 2d at 452 ("A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable").

## CONCLUSION

For the reasons previously discussed, we affirm the judgment entered by the circuit court on the jury's verdict. We deny the request by JMS and Inendino for a new trial or a remittitur as to plaintiff. We deny the request by JMS and Inendino for judgment notwithstanding the verdict

1-08-1072

or a new trial as to Benchmark.

Affirmed.

O'BRIEN and NEVILLE, JJ., concur.